NOTICE
Decision filed 11/22/16. The text of this decision may be changed or corrected prior to the filing of a Peti ion for Rehearing or the disposition of the same.

2016 IL App (5th) 130119

NO. 5-13-0119

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 11-CF-660 |
| | ) | |
| MICHAEL S. BURGUND, | ) | Honorable |
| | ) | Ann Callis, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE STEWART delivered the judgment of the court, with opinion.
Justices Chapman and Cates concurred in the judgment and opinion.

**OPINION**

¶ 1     A jury found the defendant, Michael S. Burgund, guilty of five counts of predatory criminal sexual assault of a child (720 ILCS 5/12-14.1(a)(1) (West 2010)). The circuit court sentenced the defendant to natural life in prison. The defendant appeals his conviction, arguing that the circuit court erred in precluding him from presenting certain testimony, including expert testimony, that he argues would have supported his claim that he gave a false confession. The defendant also argues that the circuit court abused its discretion in allowing the State to present hearsay statements of one of the victims pursuant to the exception to the hearsay rule contained in section 115-10 of the Code of

1

Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10 (West 2014)). For the following reasons, we agree with the defendant's argument that the circuit court improperly excluded testimony that would have supported his false confession defense. These erroneous evidentiary rulings denied the defendant his constitutional right to a fair trial. We, therefore, reverse his convictions and sentence and remand for a new trial.

¶ 2                              BACKGROUND

¶ 3     The charges against the defendant stem from allegations that he committed acts of sexual penetration upon his two minor daughters, M.B. and K.B. At the time of the trial, M.B. was five years old, and K.B. was three years old. The alleged abuse occurred when M.B. was between the ages of 1 and 3½, and K.B. was between one and two years old. M.B. testified at trial, but K.B. did not. M.B.'s trial testimony was vague and inconclusive. Medical testimony presented by the prosecution was also inconclusive; while some of the medical evidence supported the State's allegations, the evidence was also explainable by potential innocent causes.

¶ 4     The State's evidence of the defendant's guilt consisted largely of a videotaped confession that he voluntarily gave to a detective with the Alton police department at a time when he was not under any suspicion of any wrongdoing. In addition, the State's case relied on hearsay statements M.B. allegedly made to Melissa, who is the children's mother and, at the time of the alleged abuse, was the wife of the defendant. The State also relied on hearsay statements M.B. allegedly made to Melissa's mother, Mary Buttry. Accordingly, the success of the State's case was heavily dependent upon the credibility of the defendant's confession and the credibility of Melissa and Buttry.

2

¶ 5    The defendant testified in his defense and denied abusing his daughters. His defense was based on a claim that he gave a false confession because of coercion, suggestion, and manipulation by Melissa and Buttry. He claimed that they created a coercive and accusatory psychological environment throughout his marriage. He emphasized that he, Melissa, and Buttry had deeply held religious beliefs and that Melissa's and Buttry's coercion involved religious overtones, false accusations of sexual lust, and claims by both Buttry and Melissa as to having God-gifted, supernatural powers of "discernment." He maintained that the coercion ultimately caused him to falsely believe and confess that he had abused his children. He claims that, after his arrest and removal from Melissa's and Buttry's influence, he realized that he had given a false confession to crimes that had never occurred.

¶ 6    On appeal, the defendant argues that the circuit court improperly excluded testimony from witnesses who would have corroborated important aspects of his testimony concerning the psychological conditions leading up to his false confession, particularly his description of continual accusations by Melissa involving religious and sexual overtones and her claim to have the power of discernment. The defendant also argues that the court improperly excluded testimony from a psychological expert who would have opined that his psychological conditions made him highly suggestible and easily led, especially in matters involving religious or sexual overtones.

¶ 7    In order to fully understand and analyze the defendant's claims, we must set out the unique and unusual facts of this case with particular detail. Our background discussion focuses only on the testimony presented at the jury trial. In our analysis of the

specific issues raised by the defendant, we will provide further facts that were adduced outside the presence of the jury that are relevant to the circuit court's evidentiary rulings.

¶ 8    Melissa and the defendant were married in 2006, and they lived with Buttry for 2½ to 3 years before they obtained their own residence. Buttry testified that she, Melissa, and the defendant attended the same church, The River of Life in Alton, Illinois. Melissa testified that their attendance at the church was sporadic. She stated, "there were seasons where we were every Sunday, some Wednesdays. There were times when we would miss on occasion." The pastor of the church, Mark Church, testified that when they first came to the church, they came consistently, then "sporadically later, and then hardly none at all then after that."

¶ 9    Buttry testified that she was familiar with the concept of discernment. She explained that discernment was the ability "[t]o see past just what's in front of you." As an example, she stated that normal discernment is "if your child is acting happy, and you can see that they're just acting happy and that they're really sad about something, and you see past that that they're really bothered instead." She also described supernatural discernment, which can be a gift from God. She explained supernatural discernment as taught in their church as follows:

> "In the Bible it talks about there are different gifts. So, like where discernment is a normal thing, then someone might have a discernment that's a gift, and they would be able to discern things that no one—no one else could."

4

¶ 10     Buttry denied having supernatural discernment as a gift from God and denied ever telling the defendant that she had the gift of discernment. She also testified that discernment was "in scripture" but that the church did not "elaborate on it or anything."

¶ 11     Melissa also testified about "discernment." She told the jury that she "believe[d] in discernment" but was not an expert on it. In describing her understanding of discernment, she told the jury that it was "being able to understand something maybe. *** I don't know." When asked whether discernment was being able to see that the defendant was lusting, she replied, "I don't even understand what that question means." When asked whether she had ever told anyone that she had discerned that "somebody was a very lustful person," she answered, "Now, why would I say that?" She testified that she would never say anything like that.

¶ 12     Their pastor, Mark Church, testified that discernment meant "you think you can figure something out. *** You're smart. You have wisdom maybe." When asked whether discernment was something that is used often in his church, he testified, "um−I don't know if it's−it's used. I mean, we a−you know, we teach that we should seek wisdom, you know, from the Lord in our lives." When asked whether Buttry ever told him that she has a supernatural power of discernment, he responded, "Not that I can recall." On cross-examination, the pastor testified that in "First Corinthians 12 there's a list of gifts" and "there is a gift of discernment in that list." He added, "we don't teach on First Corinthians 12 much. So, I can't really tell you that a−it's something that we emphasize."

¶ 13     Buttry testified that the defendant and Melissa had verbal and physical arguments during their marriage, but neither was physically abusive toward their children. She

testified that she was concerned about their verbal and physical arguments on occasion. On one occasion, she told Melissa that physical arguments were not going to happen in her house and that, if it happened again, she would call the police.

¶ 14   On cross-examination, Buttry explained that the arguments between Melissa and the defendant concerned the defendant's "lust." She testified that during or after the arguments, Melissa told her that she had to remove certain things from around the house because she was "upset about what [the defendant] was telling her that he was attracted to." The things Melissa told Buttry to remove from her house included angel figurines, babysitter pictures on the refrigerator, children's books, and princess books.

¶ 15   Buttry testified that the defendant was present at times when Melissa told her that she had to remove these things from the house. She told the jury, "Sometimes he would acknowledge what's going on." She explained, "he would just put his head down, and, you know, acknowledge that, yeah, that was the case. *** That that needed to be removed, or a–maybe, even, you know, say, well, you know, you just–it–it's something that bothered him."

¶ 16   Melissa described her marriage with the defendant as "[w]eird, exhausting." She admitted that they would fight verbally and physically but testified that the police were never involved in their fights. She admitted to punching the defendant in the eye at times during physical confrontations, resulting in him having a black eye two or three times, and admitted to "head butting" him two separate times when he either held her down or held her against a wall during a fight. She said she received bruises on her arms and legs during physical fights at times.

6

¶ 17 Melissa testified that the defendant had a "continual desire for things outside of the home." She explained, "whether it was some cartoon characters to just even—we could be outside on our front porch and if they [*sic*] were the sounds of kids coming off the school bus walking across the street, those things were continuously brought up that they were a bother to him."

¶ 18 On cross-examination, Melissa told the jury that she never accused the defendant of lusting after toys or princess books. Instead, he would tell her that he was lusting after a toy or a picture and ask her or Buttry to remove it. She testified that he "asked my mom and me on several occasions to move different objects—books, movies, anything that was around that he would constantly refer to as giving him anxious wrong thoughts." She denied that she ever accused him of lusting after other people or, as an example, lusting after a woman in a car behind him after he looked in his rearview mirror. She told the jury that she never told the defendant that his lustful thoughts after looking at somebody else was the same as committing adultery, adding that she would never do that to anyone and that acting that way would be "crazy."

¶ 19 Melissa testified that, when they moved out of Buttry's house, they initially moved into an apartment for six months. She testified that, during this time, she had an affair, and the defendant became aware of it. She testified, "He became very arrogant towards me about it. He told me that it turned him on, and that was basically the sum of it." According to Melissa, the defendant was not "overly pleased with [the affair], but he didn't stop the relationship." She testified that they sought counseling with regard to their marital issues, and the defendant mentioned that while feeding M.B. her bottle as an

7

infant, he often "had images of putting the bottle or her binkie in her private areas." She testified that he made similar comments about children "very often." She told the jury that she never called the police because he reassured her "that they were simply thoughts, and that he would never act on them."

¶ 20    Melissa testified that the defendant forewarned her that his parents were "weird" and that he "wore a different hat for them." She testified that after they married, she did not have "much of a relationship [with his parents] other than just the surface." There was an 18-month period after M.B.'s birth when she did not have any contact with the defendant's parents. She testified that she did not forbid him from seeing or calling his parents or inviting them over.

¶ 21    At some point after K.B. was born, Melissa contacted the defendant's mother and asked if she could come over with the kids and spend time with her because she did not "want to continue this way." After that point, she saw more of the defendant's parents.

¶ 22    At trial, Buttry testified about events involving M.B. that raised her concerns about the defendant. According to Buttry, an incident occurred when M.B. was "[m]aybe a year old." She testified that, while giving M.B. a bath, M.B. pushed her toys against her private areas. Buttry said that "[M.B.] would grab [her genital] area and just really grab it and pull it." She stated that this went on for "a good while." She admitted that she did not examine M.B. for any kind of medical problems, such as diarrhea or diaper rash, when the incident occurred.

¶ 23    Buttry testified that she did not notice anything else that concerned her until another incident when M.B. was 15 months old. This incident occurred while she was

8

changing M.B.'s diaper. According to Buttry, M.B. "pointed to her genital area and said, 'da-da.' " She testified, "So, when she did that and was like looking at me the way she did, it was like she was communicating to me, and so when she said that, you know, I just connected the dots." On cross-examination, she could not recall whether M.B.'s only words at the time were "da-da."

¶ 24    Buttry testified that she told her husband about the incident, and then they "sat down with [the defendant] and asked him." According to Buttry, his response to their inquiry was "[O]h, no way. There's no way I could ever do anything like that." Buttry testified that he responded "absolutely not" in a "convincing manner." She testified that she shared her concerns with Melissa, but Melissa did not believe that the defendant could do anything like that. Buttry, therefore, "tried to embrace the fact that *** he was very convincing" and did not report anything to any authorities. She suggested to Melissa that the defendant should not give M.B. any more baths.

¶ 25    Dr. Laura Hill, a pediatrician, testified that she had treated both M.B. and K.B. since at or near the time of their births. She testified that on March 23, 2009, when M.B. was two, she treated her for complaints of vaginal itchiness for two weeks. In addition, M.B. had been complaining of pain when wiping or when diaper cream was applied. Dr. Hill testified that possible causes for the symptoms were diaper rash, infection, local skin irritation, a child falling or injuring herself, or digital penetration. Her diagnosis was "Dysuria or difficult or painful urination." She testified that, at that point, there was no reason to question whether child abuse was involved.

¶ 26   Lab test results received two days later were "negative for infection." The doctor suggested that Melissa use diaper cream for a week and "no bubble bath, rinsing with clear water." Melissa, however, told the doctor that she wanted to hold off on using diaper cream because M.B. also had itching and pain in her pubic bone area. At that time, M.B. had a broken foot in a cast, but Melissa had told the doctor that the accident that caused the foot injury would not have caused a pelvic fracture. The doctor testified that trauma was high on the list of possible causes of the type of pain Melissa reported. She also believed that digital penetration could cause the reported pelvic pain.

¶ 27   Dr. Hill saw K.B. on January 3, 2011, "with complaints of her bottom hurting for one month." Melissa told the doctor that there was no rash or redness in the area, that K.B. was refusing to wear a diaper during the day, that it hurt her to sit down, and that she was unable to ride her bike. Dr. Hill's examination did not reveal any redness or rashes. She testified that trauma, including sexual assault by digital penetration, could cause the reported pain with no physical symptoms. Her diagnosis was "perineal pain or pain in the diaper area," which Dr. Hill felt was "an unusual complaint in a child of her age."

¶ 28   Dr. Hill asked Melissa whether "there was any concern for inappropriate touch." Melissa answered that there was "no concern." Dr. Hill testified that if Melissa "had reported she was concerned about abuse, that would have risen to the top of [her] differential diagnosis." She noted that other possible causes of K.B.'s pain symptoms included falling down, falling off a bicycle, wrestling with her sister, and "any number of

10

causes." She testified that if she had suspected that K.B. had been abused, she was required to report it, but there was not enough for her to report anything to the police.

¶ 29    Melissa testified that, when Dr. Hill asked her about inappropriate touching, she answered, "That wouldn't happen." She testified that she gave that answer to the doctor despite what she claimed the defendant had previously told her "[b]ecause [she] trusted the people that [she] was with that they wouldn't hurt them." She testified that she later told the defendant about the doctor's concerns about abuse, but she did not remember his response.

¶ 30    Buttry testified that after the diaper-changing incident in which M.B. pointed to her private area and said "da-da," she did not notice any unusual behaviors by the defendant for a while, except what she described as "little things kind of throughout the years." She could not recall anything specific during this period except one example. She testified, "[H]e would take her outside to play, and our house has windows all over the place, but we have a large yard, and it does kind of slope down, and he'd take her outside to play, and you couldn't find them anywhere, and I just thought, well, why do you need to take her some place that we can't see you, you know, and it would *** kind of bother me."

¶ 31    Buttry testified that when M.B. was 3½ years old, another incident occurred, and she again became concerned about the defendant violating M.B. She told the jury about a day when M.B. dressed up in a princess costume. She testified, "[M.B. put on her costume] and got all dolled up with it. I think we fixed her hair and everything−you know, got her all pretty, and so she stood on the chair in the kitchen, and a−modeled it for

11

us, and we were taking pictures and just letting her know what a beautiful princess she was." Buttry explained that she "glanced over and noticed that [the defendant] *** was staring at [M.B.] with a−just a lustful gaze like a guy who looks at a woman when she's hot," which made her feel very uncomfortable. She testified that this incident put her on "extra alert" with respect his prior denial of violating M.B. She added that "Disney princess items" were some of the items that she had to remove from her house because "[they] just got to where [they] knew not to get things like that."

¶ 32    Buttry told the jury that, around the same time, when M.B. was 3½ years old, she kept saying "over and over again, I will never see my family again." This raised more concerns, and Buttry felt that she needed to question M.B. to find out why she was repeating this statement. She did not question Melissa about it.

¶ 33    On cross-examination, Buttry testified that M.B. was also repeatedly saying, "it's all my fault." She told the jury that this statement also concerned her, but she admitted that she determined that the statement was from the movie the Lion King. She testified, "Found out it was in the Lion King−oh, it's just a movie, the Lion King. She's not upset about something."

¶ 34    When M.B. testified at trial, she told the jury that she owned a DVD copy of the Lion King and watched it "a lot of times because [she] liked it." During questioning, M.B. recalled a scene from the movie where the "daddy" of one of the movie's characters (Simba) gets killed. She told the jury that, in the movie, Simba "screams for his daddy under his arms" and that Simba left the lion tribe, going off on his own because he thought he had done something bad.

12

¶ 35   With respect to M.B. repeating the phrase, "I will never see my family again," Buttry explained her concern to the jury with respect to this specific phrase as follows:

> "[Y]ou know, trying to figure out why she's saying this. She *** had said some different things that, you know, we found had equated to a movie and so *** when she *** kept saying this, finally one day when she said that *** I could just connect with it. This is from something somebody has said to her. I just see that.
>
> ***
>
> I pulled her to me, and I said, [M.B.], why are you saying this? And I said, has somebody ever said this to you, and *** she said, daddy. She put her head down and she said, daddy."

¶ 36   Buttry testified, "[M.B.] showed the signs of being very nervous about telling me this," and "that to me told me a lot." Buttry continued:

> "[S]o I said, look, I said, that's very good that you told me that. You told me the truth, and, I said, that's very good that you told me that, and so I said, I want to ask you something else, and it's very important that you be truthful with me on this, and you're okay, and I said, has anyone ever done anything to you that they shouldn't do. Anybody ever touched you in a way they shouldn't touch you.
>
> ***
>
> She said, daddy, and then she put her head down."

¶ 37   Buttry asked M.B. to show her where she had been touched, and according to Buttry, M.B. "very nervously *** touched herself in numerous areas of her body and touched her head and her shoulders, and just, you know, numerous areas, and then she touched her genital area."

13

¶ 38    During cross-examination, Buttry agreed that discernment was the ability "to just see past what is right in front of you." She was asked, "Is that kind of like whenever a−it's all my fault? I'll never see my family again? You saw past−past that that [M.B.] was being abused?" She answered, "Right, which is very parental."

¶ 39    Buttry testified that, after her conversation with M.B., she did not immediately call Melissa, the defendant, or the police because she did "not want to jump to conclusions." Instead, she told M.B., "if this ever happens again, I want you to tell daddy that you've told Monga." She explained that "Monga" was M.B.'s name for her.

¶ 40    Although Buttry did not discuss her concerns with Melissa, Melissa told the jury that, in March 2011, she became concerned that M.B. "was never happy to come home in the evening" from Buttry's house. Melissa testified:

> "If we were at my mom's that day, or if she was at my mom's that day, she was not happy to come home in the evening to stay the night there. She was not okay with it to the point of getting sick.
>
>     She often referred to our house as being scary and stupid. Constantly terrified at night. Waking up from dreams or not wanting to go to sleep at all. Picking her toenails to the point of bleeding.
>
>     Constantly saying that she was afraid I was going to die, or that someone was going to hurt me, or that same thing for her, and that she would never see her family ever again."

¶ 41    Buttry told the jury that a few weeks after she first talked with M.B. about her daddy touching her, another incident occurred. She testified that "just in some setting

14

[M.B.] said, Monga, nobody can ever touch my pee-pee, and I'll tell you and mommy and daddy." She then asked M.B. if "something happened," and M.B. responded "yeah, but *** daddy is very sorry, and he'll never do it again." At this point, Buttry still believed that she did not have anything to present to Melissa, so she "just waited."

¶ 42 A few weeks later, on Wednesday, March 30, 2011, Buttry picked up M.B. to babysit. She explained to the jury what happened as follows:

"I put [M.B.] *** in her car seat *** was getting ready to back out of the driveway, and [M.B.] said that again. You know, Monga, nobody can ever touch my pee-pee, and I said, you're right. You know, and I said again, has something happened? And she said, no, and that has never happened in my whole life. And I said, well, [M.B.], I said, you told me that that has. And I said, in fact, you told me that daddy had done that. And she said, yes, but he's very sorry, *** and she said, I'm not to talk to about that to anybody at school."

¶ 43 Buttry explained that when they got back to her house, she sat M.B. on her lap and told her that "this has got to stop." She asked how long it had been going on, and M.B.'s response was "a short time." According to Buttry, M.B. got "worried and nervous" and said, "is daddy in trouble again." Buttry testified:

"And I said again, not yet, and then she got very worried, and she like kind of lunged forward, and she said, don't tell mommy. Mommy is going to be so mad. And I said, well, look, I said, honey, you did the right thing telling me the truth didn't you."

15

¶ 44    According to Buttry, M.B. agreed with her that it was good that she told her the truth, and Buttry then explained that it was also important to tell mommy the truth. Prior to this time, Buttry had not talked to Melissa about her concerns of the defendant touching M.B. since the time she told Melissa about the incident involving M.B.'s gesture to her genitals while stating "da-da" when she was changing her diaper.

¶ 45    Buttry took M.B. home to Melissa. At this time, Melissa was pregnant with a third child. Buttry told Melissa, "[M.B.] has been violated, and I know by whom." She told Melissa that the defendant had violated M.B., while M.B. stood next to her. Buttry testified that she could not "remember exactly *** from that point on what all happened," except that Melissa "took a hold of [M.B.]," who told her "that daddy had touched her pee-pee and put his on top of her head."

¶ 46    Melissa testified that when Buttry told her what had been happening, she "asked [M.B.] if there was something that she wanted to tell me." Melissa testified, "she was hesitant, and I said, if there's anything that you need to tell me about daddy, you can tell me. You can trust me. It's safe. You're fine, and a−she finally told me that−that daddy had been touching her." According to Melissa, "[s]he pointed to the top of her head, her mouth, her girl parts, and her bottom." She said that M.B. "referred to a froggy game" and told her "that the frog−made her put his penis in her mouth." She was asked, "Did she use that word?" She replied "No" and that she did not "remember what word she used." Melissa testified that she "[t]ried to hold it together," called the defendant at work, and asked him to come home.

16

¶ 47    Buttry testified that the defendant came home from work after Melissa called him and that Melissa then confronted him with what M.B. had said. Buttry was present during this conversation. She testified that she did not "remember from this point" but added that she remembered "[the defendant] kind of doing that step back like, no, you know, type of response, and then from that point on taking the–you know–it−I know he numerous times kept saying, well, if she said I did, I must have, but I just don't remember, or something maybe if she said I did, I must have, but I don't remember."

¶ 48    According to Melissa, however, the defendant never denied abusing M.B. She testified about her conversation with the defendant after he came home as follows:

> "He and I were in the living room, and I told him I had to ask him a very serious question, and I needed him to be very honest with me.
>
>      I said that [M.B.] had said these things had happened, and, um, he didn't deny it. He just kept saying things that [M.B.] is telling the truth. The evidence is there. Just those kind of things over and over."

¶ 49    On cross-examination, Melissa agreed that the defendant initially said he did not remember, but that it could have happened. A detective with the Alton police department, Michael O'Neill, testified that when he talked to Melissa about her initial conversation with the defendant, she told him that the defendant "denied and denied and denied."

¶ 50    Buttry testified that, after this initial conversation with the defendant, Melissa left the house with the children, and she then had a conversation with the defendant alone. According to Buttry, the defendant stated that "he kind of remembered something upstairs, but he just couldn't remember what had happened." She suggested that he go

17

upstairs to see if he could "reacquaint" with his memory. Initially, she went upstairs with him, and she testified that he "kept saying that he was just blank–blacked out." Buttry responded, "I bear witness to that." She explained that she said "I bear witness to that" because "he's very convincing, and I, you know, thought that was genuine, and so that's what I was trying–I was trying to help him be comfortable." She testified that she left the defendant alone upstairs and that he returned downstairs and said "that he remembered putting his penis on her head." Buttry testified that the defendant also said, "I would of just said the whole thing, but I knew I'd go to jail."

¶ 51    For the first two nights after this abuse revelation, Wednesday night and Thursday night, M.B. and K.B. stayed with Buttry at her house, and the defendant stayed with Melissa at their marital home. According to Detective O'Neill, when he talked with Melissa about where the defendant stayed after she accused him of abuse on Wednesday, she told him that she did not know where to put him "until [she] had his confession."

¶ 52    Buttry testified that after they confronted the defendant she did not have any further discussions with M.B. about what had happened in order to "guard her mind." Melissa told the jury that the defendant kept asking her what she "was going to do about it" but that she could not process her thoughts yet.

¶ 53    Melissa testified that the defendant went to work on Thursday but called her "continuously" wanting to know what she was going to do. She told him that she did not know. She testified that he was supposed to work the next day, Friday, but he woke up early in the morning and was anxious about what she was going to do. When he was late for work, his boss called. She said that the defendant was "was rambling on the phone."

18

She testified that she took the phone and told the boss that the defendant was not wanting to come to work because there had been "a family issue."

¶ 54 After two days, M.B. and K.B. returned home to stay with Melissa, and the defendant left the home to stay with Buttry. Melissa testified that the defendant had no objection to staying at Buttry's house. Buttry testified that, at that point, they had not called the police because they "didn't know how to handle this." The defendant stayed at Buttry's house the next three nights: Friday night, Saturday night, and Sunday night. According to Buttry, during this time, the defendant stayed in one of her spare bedrooms and "journaled." Buttry was not home a lot during this time because she spent time with her brother, who was dying. Melissa testified that the defendant continued to call or text her from Buttry's house.

¶ 55 Buttry testified about a conversation that she had with the defendant Saturday evening. Buttry did not "really remember much" except that she remembered telling him that he needed to let them know what all he had done so that M.B. could get counseling. She remembered the defendant then calling Melissa and, while shaking, "started telling her what he had done." She could not remember what he specifically told Melissa on the telephone but testified that he was shaking and that she could tell he was divulging. She got up and left the room during the telephone conversation.

¶ 56 Melissa testified about getting the telephone call from the defendant that Saturday evening. She said, "He called and told me that he wanted to be honest with me and tell me a—things like what the froggy game meant, and that he had, indeed, been touching both the girls." She said that he admitted "that he had been sticking his fingers in the

19

girls' bottoms and their girl parts" at "every chance he got." When asked why she did not go to the police at that point, she testified, "I wanted to protect my girls, but I love my husband."

¶ 57   The next day, Sunday, April 3, 2011, Buttry and her husband took the defendant to see Pastor Church. She told the jury that this was her idea. On cross-examination, she admitted that she wanted the pastor to hear the defendant's confession because she wanted to make sure that a third party heard the confession before they went to the police. She added, however, that this was not her "heart motive," which was to see whether it was possible that the defendant could get counseling. According to Detective O'Neill, when he interviewed Melissa, she told him, "Once I had that confession and he is locked in, it wasn't just me or my mom against him or anything. You know, we had our outside source with our pastor, so that way whenever I go to the cops, he can't deny it." During her testimony, Melissa denied making this statement to the detective but admitted that she felt better knowing that it was not just her and her mother who had heard the defendant's confession.

¶ 58   The pastor testified that he got a call from the Buttry family asking him to meet them at the church that afternoon. They met in the church's coffee shop. Buttry told the pastor that they had a serious situation in their family and that the defendant needed to share what had happened. According to the pastor, the defendant looked at him and said "since my girls were one-year-old I have been abusing them in the worst possible way." No one provided the pastor with any details of the abuse. Pastor Church described the defendant's demeanor as "[s]olemn, sincere." He testified that they spent 15 minutes

20

praying and that he felt his role was to minister to them about God's love. According to the pastor, the entire meeting lasted 15 to 20 minutes.

¶ 59 Sometime after the meeting, the pastor called Buttry and told her that he was obligated to "take this to the legal authorities" and that he wanted to confirm that they were planning on doing that. He testified that he was insistent that they let him know that they went to the authorities by Monday morning.

¶ 60 Melissa testified that, after the defendant's meeting with their pastor, the defendant sent her a text message stating that everything went well with the pastor, that he was on his way into work, and that he would talk to her later. On cross-examination, she testified that, later that Sunday evening, the defendant called her on his way back from work and told her that, after thinking about an episode of *48 Hours Mystery* that he had recently watched on television, he no longer believed that he had abused his daughters.

¶ 61 Melissa told the jury about a nightmare that M.B. had that Sunday night as follows:

> "[M.B.] woke up from a nightmare, which was not unusual, but this time instead of just comforting her, I−I asked her what was wrong, and she kept pointing to a tent that they had in their room, and I asked her what was wrong with the tent, and she said that daddy had pushed her down in that tent, and I said, well, did he help you up. She said, no, he did not, and I−so, I asked her what did daddy do, and she told me daddy had hit her and wouldn't let her up, and said that she was dumb, stupid, ugly."

21

¶ 62    According to Melissa, she confronted the defendant about M.B. claiming that he had pushed her into the tent and had told her that she was dumb, stupid, and ugly. She testified that he admitted doing it and told her that "it turned him on" and "that afterwards he would have them pleasure him in some way."

¶ 63    The next day, Monday, Buttry and Melissa took M.B. and K.B. to Dr. Hill for examinations. Buttry left during the middle of the examinations. She testified that she called the defendant's boss, drove to his place of employment, picked him up, and drove him to the police station. She told him that the pastor had given them 24 hours to get him to the police station.

¶ 64    On Monday, April 4, 2011, Officer Michael Beaber with the Alton police department was assigned to desk duties at the police station. He told the jury about the defendant walking into the police station that day, approaching his desk, and calmly telling him that he wanted to turn himself in for molesting his two daughters for the last couple of years. Officer Beaber testified: "[H]e goes into telling me that basically in the last couple of years his three year old daughter [M.B.], he has on approximately 30 occasions stuck his finger in her vagina and anus and on a couple occasions made her perform oral sex to him, and he said with his two year old daughter [K.B.] he has done the same thing approximately 15 times, stuck his finger in her anus and vagina but he said he didn't make her perform oral sex on him." The officer testified that "it was an unusual case where somebody walked in and to basically confess." He described the defendant's demeanor as nervous but cooperative.

22

¶ 65    Officer Beaber arrested the defendant, contacted the child abuse hotline, and notified the Department of Children and Family Services (DCFS) of the incident. At that point, Detective Michael O'Neill took over the investigation.

¶ 66    Dr. Hill testified about her examination of M.B. and K.B. that day. She examined M.B.'s pelvic region and did not find any trauma. M.B.'s physical examination was normal for a child her age, which, the doctor testified, was "most common with sexual abuse." She added that "[i]n most cases of sexual assault there [are] no visible findings." She also examined K.B., and her examination was normal as well. She again testified that a normal examination "is expected." She testified that, during this visit, Melissa appeared "to be tearful on multiple occasions, heaving, looking to me devastated and upset, repeatedly crying."

¶ 67    While at the doctor's office, Melissa received a telephone call from Detective O'Neill. Detective O'Neill told her to bring the children to a child advocacy center after the doctor's appointment, where they were to be interviewed by forensic interviewer Kim Mangiaracino.

¶ 68    Mangiaracino told the jury about her forensic interview of M.B. Mangiaracino described the protocol that she used for conducting a forensic interview of a child and testified that she had training on the protocol. Only she and M.B. were in the room during the interview. She testified that she conducts her interviews in a room with a two-way mirror through which investigators, DCFS, and/or the prosecutor can view the interview. The person who brings the child to the interview waits in a waiting room during the interview.

23

¶ 69    Mangiaracino stated that M.B. was three years old and that, in her experience, she could interview a child that age for about 15 minutes due to the child's limited attention span and ability to communicate. She testified that children M.B.'s age can answer "who did something, and what they did, and outside of that it's above−beyond their ability usually." She believed that where, when, and the number of times were typically outside a three-year-old's ability to answer with accuracy. She said that M.B. seemed to be an average three year old.

¶ 70    A video recording of Mangiaracino's interview of M.B. was admitted into evidence and played for the jury. Prior to the interview, Mangiaracino knew that there were allegations that M.B.'s father had sexually abused her. During her testimony, she described M.B.'s statements during her interview as including, among other things, motioning toward her private area and stating that her daddy touched her "pee-pee." Mangiaracino testified that she also attempted to interview K.B., but ended the interview after five minutes or less, determining that K.B. was too young to communicate.

¶ 71    Melissa testified that later that day, she found a letter handwritten by the defendant dated April 2, 2011. The letter was in the room at Buttry's house in which he had been staying prior to his arrest.

¶ 72    Detective O'Neill testified that, following the children's forensic interviews, he talked with Melissa "to kind of get some type of context for *** what [M.B.] actually had said," adding that K.B. "was not extremely verbal" so they did not "get any significant information from her at the time." He testified that, after he spoke with Melissa, he

conducted a videotaped interview of the defendant. The defendant's videotaped interview was admitted into evidence and played for the jury.

¶ 73 During the interview, the defendant confessed to molesting both of his children. Detective O'Neill testified that the defendant was very remorseful and sad. He indicated that he was sorry for what he had done and wanted to get help. He admitted that if his actions had not been discovered, he would have continued until the children's verbal skills developed and they could reveal what he was doing. He stated that he was molested by his mother but did not remember it.

¶ 74 The next day, Tuesday, April 5, 2011, Detective O'Neill conducted videotaped interviews of both Melissa and Buttry. These interviews were not admitted into evidence or played for the jury. However, at the conclusion of Melissa's interview, while the video camera was still recording, Melissa asked Detective O'Neill if she could say good-bye to the defendant. Detective O'Neill escorted the defendant to a room where Melissa spoke to him. The video camera recorded Melissa saying good-bye to the defendant and telling him that she had found the letter in the spare bedroom at Buttry's house. She testified, "he basically said he was sorry for what he had done in that letter. So, I told him I would show that to the girls so that—that they would know that he was sorry for what he had done." She kept the letter in her possession when she left the police department that day. The video recording of Melissa's conversation with the defendant was admitted into evidence and played for the jury.

¶ 75    During his investigation, Detective O'Neill obtained a search warrant to search the defendant's laptop computer and cell phones. A forensic analysis of those items revealed "nothing significant of evidentiary value."

¶ 76    After the defendant was in custody, Melissa received a letter from him dated April 12, 2011. In the letter, he stated that he hoped the family did not think too badly of him and that he wanted her to explain that he was sorry. Melissa sent a reply letter, telling him that her family was not judgmental, would see it as sin, but would "love him apart from that." In May 2011, she received a Mother's Day card from the defendant. Inside the card, he wrote, "In spite of everything you have done, wrongly accused me with, and manipulated me into believing. Because I did Not hurt our girls in that way at all. You still remain a wonderful mom." He wrote that he believed that she was a "great mom" to their girls and that he was praying for her and her pregnancy. He concluded, "I love you & Happy Mother's Day." This was the last communication Melissa received from him.

¶ 77    Detective O'Neill testified that, on April 2, 2012, seven months before the jury trial, he received a call from Melissa, who told him that she had the defendant's handwritten letter that she had found at Buttry's house. Melissa testified that she turned it over to the detective when she "came across it again." This letter was admitted into evidence as People's exhibit No. 18 and is described in more detail below.

¶ 78    At trial, the State presented the testimony of M.B., who was 5 years old at the time. During her testimony, she was asked why her daddy did not live in her house anymore, and she testified, "It's because he is mean and acts–the devil kind of like maybe he tricked him and he started to be mean." The following colloquy then followed:

26

"Q. How was he mean, [M.B.]?

A. Like everything he did to like my sister yesterday. He had a–

Q. So when you said he was mean to your sister and was he mean to you too, [M.B.]?

A. Yes.

Q. Yes. Did he ever touch you?

A. Yep.

Q. And where did he touch you?

A. By my private.

Q. And what did he touch you with?

A. Like everything on him or anything like he used on food.

Q. Did he ever have you do anything to his body?

A. Well, no, but he did something to–not him but he did something to us.

Q. Okay. And did he do something to your sister?

A. Yeah.

Q. And did you see that?

A. Yeah.

Q. Did he also touch her?

A. Yeah.

Q. Where did he touch her?

A. Like everywhere I said yesterday. He touched her just like me.

Q. Just like you. Did you ever tell anybody that that was happening?

27

A. Yeah.

Q. Who did you tell?

A. My grandma and my papa and my mom.

Q. And you told your mom?

A. Yeah.

Q. Did you end up going to the doctor sometime to Dr. Hill?

A. Yeah."

¶ 79 On cross-examination, when asked how many times she "talked to grandma about the bad touching," M.B. testified, "Like all day so I would like keep like watching on daddy so he couldn't touch my sister, kind of sad." She was asked, "How many times did you talk to grandma about that," and she said, "Like every single day about my daddy and my sister."

¶ 80 The defendant testified on his own behalf, denying that he abused his children. He testified that his grandfather was a pastor for 37 years and that he was raised in a family of "very very strict Christians." He grew up attending church Sunday morning, Sunday night, Wednesday evening, and sometimes in between. His church's denomination was "an Assembly of God, which is a Pentecostal church." According to the defendant, the only acceptable reason for divorce in the church is adultery.

¶ 81 In support of his claim that he gave a false confession as a result of a coercive atmosphere created by Buttry and Melissa, the defendant testified about his relationship with Melissa both before and after they were married. He told the jury that, prior to the marriage, he was invited to an internship with a Christian ministry in New York, and a

28

conflict arose with Melissa about the internship. His brother encouraged him to go to the internship. He testified that Melissa told him that she was "a very discerning person" and had discerned that he should not go. He interpreted her claim of discernment as meaning that she claimed to be able to see things that nobody else could see and understand things that others could not understand. She told him that the ministry associated with the internship was fake and corrupt. He decided to go anyway.

¶ 82    The internship was supposed to last nine months, but the defendant stayed only two. He testified that Melissa was happy when he returned but resentful that he had followed his brother's advice instead of hers. He stated that she "harped" on him that he had made a bad decision in taking the internship in New York by stating that she had "discerned that [he] should not go" and that she was the one who heard from God, not his brother. He testified, "there was parts of me that says maybe she's legit and maybe she's not." He told the jury that she also resented him going on a 10-day mission trip and that she established a rule that he could no longer leave on trips or their relationship would be over.

¶ 83    The defendant told the jury of another incident that occurred at Melissa's house prior to their marriage when a woman called his cell phone. Melissa took the phone, and the woman claimed that she had been with the defendant the week before. He told Melissa that he had no idea what the call was about, but Melissa did not believe him and accused him of running around with this other woman. He testified that Buttry was also at the house when they received this call, and she joined Melissa in accusing him of being

29

with this other woman. He testified that they did not accept his denials. He agreed to change his cell phone number and volunteered to go to the police to report the call.

¶ 84    The defendant described to the jury a physical confrontation with Melissa later that evening over the phone call when Melissa began "wind-milling [him] one after the other, left, right, left, right." He grabbed her shoulders, pushed her, and told her to stop. He said, at that point, she head-butted him three times and tried to knee him in the groin. He admitted that he head-butted her back. Later, they each apologized, worked things out, and got married.

¶ 85    The defendant testified that, after they were married, there were many instances when Melissa questioned him about why he was looking at another woman or why he was watching a particular commercial. He said that about a year into their marriage, Melissa began making "very very strong accusations of [him] having what she call[ed] a wandering eye." He described instances in which she accused him of looking at other women in cars as he was driving and looking at women in restaurants and in other public places. He testified that, while driving, he was not allowed to use the vehicle's mirrors because she thought he "might be checking out other drivers." When not driving, he was required to keep his head straight down or straight in front of him. He claimed that she accused him of turning his head and lusting whenever a lotion commercial was on television. He testified that he denied her accusations but also told her that he could not say that he "never had an impure thought about another woman." He testified that she then "popped him" and told him that, according to Jesus, he was committing adultery every time he looked at a woman with lust in his heart.

30

¶ 86    The defendant told the jury that Melissa accused him of being a lustful person throughout their marriage on a daily basis. He claimed that there were times when she stood outside the door while he went to the bathroom. When he came out, she accused him of "touching" himself in the bathroom while looking at "women in the magazines," which included Country Living and Better Homes and Gardens. He told the jury that she accused him of lusting after images in a princess book and after their children's dolls. He testified that he was not allowed to be around her friends because she was convinced he was lusting after them.

¶ 87    The defendant stated that Melissa told him that he had to be very honest with her and tell him if he ever "saw anything sexually related, a beautiful woman, if [he] had a bad dream where there was a woman present." According to the defendant, Melissa emphasized that telling her and being honest with her was the only way God was going to be able to help him with his lust issues.

¶ 88    The defendant told the jury that Melissa claimed to have "spiritual discernment." As an example, he explained that when he tried to get her to attend his church, which his grandfather had founded, she told him that she had "discerned that the pastor there was actually a sexually deviant; that he wasn't sexually pure; doing these things in secret."

¶ 89    The defendant testified that during the marriage, he sustained at least 20 black eyes, bloody lips, and bloody noses, a concussion, and a gash on his forehead from a head-butt. He stated that one time "she was so exasperated in the fact that she thought he was lusting" that she put a knife to his chest and slashed him across his chest and leg,

31

cutting his shirt and pants. He explained that he never called the police because he loved her.

¶ 90    The defendant testified that Melissa was "very very hateful" and that her verbal abuse was constant. He testified that, among other things, she told him that he was sick, was a terrible father and husband, and was a "fucking piece of shit." He claimed that, at one point, she told him that he needed to end his life. According to the defendant, she told him that she had been researching sexual addiction, that she came across the term "blackouts," and that she thought he was having "blackouts." He testified, "She said I was so sexually perverted that I was doing things or had done things in the past that I had literally blacked out, meaning I didn't remember anymore because they were so graphic or disgusting."

¶ 91    According to the defendant, Melissa told him that he needed spiritual counseling to be healed from his lust issues. When they had discussions with a counselor, the discussions were always about his lust issues or problems that they were having with his mother. During this time, Melissa had the extramarital affair, but, according to the defendant, the affair was not discussed with the counselor. He testified that Melissa agreed that they should discuss her anger issues with the counselor, but she never did so.

¶ 92    The defendant explained that the constant accusations made him "a wreck inside," so he went to see a psychiatrist and asked for anxiety medication. The psychiatrist prescribed Celexa and Xanax. He testified that he started feeling guilty because he knew he found other people attractive. Therefore, he thought that maybe he was a lustful person and started thinking that their marital problems were his fault. He explained that he

32

started to believe Melissa's accusations. He testified that he became obsessed with trying to stay away from things that Melissa told him were causing his lust, which became time-consuming. He explained that innocent things started provoking lustful thoughts and that even passages in the Bible about angels "became very dirty."

¶ 93    The defendant testified that Melissa was against his mother having any influence in his life because she felt like his mother was "trying to usurp her new position as [his] woman." She limited him from seeing his parents and discouraged him from seeing them by himself. He testified that Melissa also believed that he had lust problems because she believed that his mother had molested him as a child. He told her that he did not believe that was true and that he had no memories of any abuse.

¶ 94    The defendant testified about Melissa's extramarital affair and that, while pregnant, she told him that their third child might not be his. He told her that if the baby was not his, he did not think he could stay in the marriage. According to the defendant, Melissa did not want him to leave the marriage and was nice to him for a two-week period following her admission of an extramarital affair. After about two weeks, however, she resumed accusing him of being lustful and a terrible husband.

¶ 95    The defendant told the jury about the incident when Buttry confronted him about M.B. pointing to her private area and staying "da-da" when she was 15 months old. He explained to the jury that M.B.'s first words were "da-da" and that everything at that time was "da da."

¶ 96    The defendant told the jury about the series of events that began on Wednesday, May 30, 2011, and ultimately led to his confession five days later. He headed home early

33

from work after receiving a call from Melissa, in which she told him that she was having contractions and needed to go to the hospital. When he walked in the door, he was confronted by Melissa and Buttry with accusations that he had been abusing M.B.

¶ 97 The defendant testified that they said M.B. had told them that he had touched her pee-pee and had placed his penis on her head. He testified that when he told them that was not true, they immediately started calling him a liar. According to the defendant, they then had a back and forth confrontation for approximately two hours, during which he told them that he did not do anything. In response, they told him that he needed to be honest so they could find counseling for the girls. He claimed that they initially would not let him speak with M.B. Later, they brought M.B. to stand in front of him. He told M.B. that they had been saying that he had touched her somewhere. He testified that M.B. replied, "huh-huh," and pointed at her vagina.

¶ 98 The defendant testified that Melissa and Buttry gave him the details about the allegations, including the "froggy" game, which they told him involved him placing his "pee-pee on her head." He said that their accusations were "very very detailed," including that M.B. told them that "froggy throws up" and that she "identified the color of [his] semen as white."

¶ 99 According to the defendant, during this initial confrontation, Buttry told him that she had "discerned" that his mother had molested him as a child and that this was the only reason that he could have done these things. He testified that he believed that Buttry was a discerning person and was closer to God than anyone else he had ever met. He testified that Melissa constantly told him that Buttry was a discerning person.

34

¶ 100  The defendant testified that the next day, Thursday, he went to work and received a call from Buttry, who informed him that M.B. had made more accusations. She told him that M.B. "had made a mimic of a penis movement with her finger."

¶ 101  The defendant testified that he thought there must be some big mistake and that what M.B. was saying was terrible and did not make any sense. However, according to the defendant, Buttry was very adamant that he needed to be honest and needed to come clean to save the girls, his marriage, and his relationship with God. He testified that he cried at work and prayed to God for help because he did not know what was going on.

¶ 102  According to the defendant, that Thursday evening, Melissa continued with the accusations and told him that he needed to come clean. She told him that he was too selfish and did not care about his family enough "to actually get honest." He testified that he then told her that he did not know how M.B. at 3½ years old would say specific sexual things that no little girl would know unless it had happened. He testified that Melissa kept emphasizing that he needed to be honest to save his family and relationship and to get counseling so he "can live a full life." He stated that when he kept denying the accusations, she told him, "You're just trying to hide because you think you're afraid." During this time, according to the defendant, Melissa told him that he could not call his mother and could only go to work and home. She would not allow him to talk to anyone about the accusations. He stated that she told him that if he did talk to anyone or continued to deny the accusations, they would go to the police.

¶ 103  The defendant told the jury about being late for work the next day, Friday, and that his boss called their house. He testified that he answered the telephone and told his boss

that there was a family emergency because they believed that someone had molested M.B. He testified that Melissa grabbed the phone and told his boss that he, the defendant, had been molesting M.B. When the defendant asked her why she had done that, she said, "you know it's true and he needed to know anyway."

¶ 104 The defendant testified that later that Friday afternoon, Buttry came over to his house and told him that she was going to give him one last chance to be honest before they went to the police. According to the defendant, all of their accusations at that point described abuse that took place in the loft. Buttry asked him if he wanted to go upstairs in the loft and look around and see if it reminded him of anything. He agreed, and they went upstairs to the loft.

¶ 105 The defendant told the jury that, at that point in time, he was "freaked out" because M.B. was so specific with her accusations and that he started doubting himself. He testified that when Buttry asked him to go upstairs to the loft, he had been accused of abuse over 100 times and that he had been replaying in his mind mental images of the abuse described to him, trying to make sense of it. When Buttry asked him whether there was any place in the loft that maybe he remembered, he said, "I think maybe right there in the middle." Buttry told him that was good and that he was taking little steps toward honesty. He testified, "I said, Mary I am not sure if this is a memory or if this is just something that's in my head because of the accusations. And I said I think I remember putting my penis on [M.B.]'s forehead." Buttry responded, "I bear witness to that," which he explained was a spiritual term that is identical to discernment. He testified that

36

Buttry's response made him believe that maybe he was "coming into the memories of these things" and that "God had showed her the same thing."

¶ 106 According to the defendant, Buttry hugged him and told him that he needed to keep being honest, that they were going to get counseling for him and the kids, and that everything was going to be okay. He told the jury that they then went back downstairs and that he told Buttry that he did not know that he remembered anything. He testified that she told him to stop flip-flopping if he wanted help. According to the defendant, she put pressure on him by stating that his denial was killing his children and his wife. He testified that, shortly thereafter, Melissa returned home and that Buttry told Melissa that he had a breakthrough and was taking steps in the right direction. According to the defendant, Buttry was "very warm" and encouraged him "to keep coming clean," but Melissa still did not believe he was being honest and was still "very hateful."

¶ 107 Consistent with Melissa's testimony, the defendant testified that he stayed at Buttry's house Friday night while the children stayed with Melissa. According to the defendant, that night, his head was in a "tailspin," and he started believing that he must have done what he was being accused of doing. He stated that Melissa restricted him from watching any television or being in a room with a television on while at Buttry's house. He could be in Buttry's spare bedroom only with the door open and could read only Christian books, the Bible, or listen to worship music. He testified that he had to comply or they were going to call the police.

¶ 108 The defendant told the jury that, while in his room, he wrote out answers to 10 questions that were contained in a Christian book he was reading. The questions and

37

answers were admitted into evidence as People's exhibit No. 18. As noted above, Melissa testified about finding People's exhibit 18 in Buttry's spare bedroom after the defendant's arrest. It is the "letter" that she found and turned over to Detective O'Neill.

¶ 109 The paper was dated April 2, 2011, and included the defendant's handwritten answers to questions such as, "What do you NOT want to do?" For his answer to this question he wrote:

"I do NOT want to continue in my sexual addiction. I do NOT want to destroy my marriage with lust and deception. I do NOT want to destroy my children. I do NOT want to continue the same behaviors, sins, and strongholds that I have brought into my home."

¶ 110 For his answer to the question, "What are desires of your heart?" he wrote:

"My greatest desire to see my family re-united and healed. I want to love my wife and hold her until life is over. I miss holding her so much. I want to love my children and show them how to live for God. I want them to know that I am sorry for my sins against them and that I will never be that way again. My desire is to show them that they are worth fighting for."

¶ 111 For his answer to the question, "What are you going to live for?" he wrote:

"I'm going to live for God. I'm going to live for the welfare of my children, especially after I have harmed them so extremely. I'm going to live for my wife to feel as valuable as she really is. I'm going to live in freedom!"

¶ 112 The defendant told the jury that he did not abuse his kids, but at that point, when he was in the spare bedroom at Buttry's house answering the 10 questions, he falsely

believed that he had. He stated that he did not have any memories of doing what they had accused him of doing but had visual images in his mind based on Melissa's and Buttry's descriptions. He testified that, at that time, he believed he must have done what they were saying because of what Melissa and Buttry told him M.B. had been saying and because he believed that God had revealed it to Buttry. He testified that he did not know how it happened but concluded that it must have happened.

¶ 113 According to the defendant, the next evening, Saturday evening, he had another conversation with Buttry, during which she told him that he had taken some good steps but that there were other things to which he still had not admitted. He stated that in response, he told her that he thought he remembered putting his penis on M.B.'s forehead and that he thought he remembered telling her not to tell anybody at school or at Sunday school. He testified that this was not actually a real memory. At that point, Buttry stated, "You've done this to K.B. too, haven't you," and he answered yes.

¶ 114 The defendant testified that Buttry told him that he needed to call Melissa and tell her. He then called Melissa and had the lengthy telephone conversation that Buttry and Melissa described in their testimony. He testified that, during this telephone conversation, Melissa clarified 95% of the things he later confessed to Detective O'Neill in the videotaped confession. He testified that, for example, when Melissa asked about the frequency of the abuse, he stated maybe once per month, but then Melissa told him that he was not being honest. With respect to the frequency of the abuse, he described the conversation with Melissa as a "debate to find what was an acceptable number for her to accept." He told the jury, "To me, as long as she accepted it, it felt honest to me."

¶ 115 The defendant told the jury that, during this conversation with Melissa, the locations of the abuse "broadened from not just the loft, but it went all over the house" and included various acts of penetration involving his finger and penis. He testified, "I really believed that what they were saying to me was truer than what I thought I knew." He started saying "yes" to all of the accusations.

¶ 116 The defendant testified that, later that night, Melissa called him to tell him about M.B.'s nightmare and to tell him that M.B. said that he had pushed her down next to a tent and had told her that she was dumb, stupid, and ugly. He told the jury that when he denied this new accusation, Melissa said that she was sick and tired of him being a liar. He testified that he then said, "okay, yes, yes, I did it."

¶ 117 The defendant stated that the next day, Sunday, Buttry and Melissa told him that he needed to talk with their pastor. He stated that he knew that the pastor was a mandatory reporter, and he was concerned about that. He admitted that he confessed to the pastor "very generally" by telling the pastor that he had been molesting the girls since they were one year old "in an extreme way."

¶ 118 The defendant testified that on Monday morning, he went to work "in a very very bad state of mind." He testified that Buttry called his work and told him that they needed to go to the police because there was no other way to get counseling for the children. He testified that he "had come to the place" where he had to go to the police for the girls, Melissa, and his relationship "with the Lord." He described walking into the police station, tapping on the glass, and telling the officer behind the glass that he was there to turn himself in for molesting his children. He testified that he then repeated every

accusation that Melissa and Buttry had described, including the frequency and locations. He agreed that, in his confession, he admitted to doing horrendous things to his children, but he told the jury that he did not do them. He told the jury that at the time of his confession, he thought that he had done them. He testified:

> "You get to the point where you just can't doubt it anymore. And that you might not know how to explain everything, but you just come to the place where you, okay, this is true and what I believed all along is really the lie."

¶ 119 The defendant testified that Melissa and Buttry had given him the details of the abuse during the four or five days of their accusations and conversations. He stated that if there were any details missing, he made them up during his confession so that it appeared to the detective that he was being as honest as possible. He told the detective that he was there to be honest, which was the only way he could help his children and get better because he was a sick person. He testified that, after his arrest, it took him three weeks to a month to realize that everything to which he had confessed was wrong.

¶ 120 In his defense, the defendant presented the testimony of Wanda Burgund, who had known him all of his life and was married to his uncle. She testified that the defendant "was brought up very faithfully in the church" and that they had a very tight-knit family in which church was a very high priority. She described him as being very actively involved with M.B. and K.B. and stated that the children were very affectionate toward him.

¶ 121 The defendant's mother, Donna Burgund, testified that religion was "the centralized theme" of their family and that their lives revolved around church activities

and services. She said that her family was very social, but Melissa was always reluctant to come to their family gatherings. She testified that any time the defendant was on the phone with her, Melissa was also on the phone. Donna did not see the defendant and Melissa often after they were married. She testified that while the defendant and Melissa lived with Buttry, she and the defendant's father were not allowed to be involved with their grandchildren. They were not invited to birthday parties, baptisms, or family events.

¶ 122  On one occasion, Donna called their house and told the defendant that she wanted to speak to M.B. before they left for a trip. The defendant told her to come over. According to Donna, Melissa was very upset when she and the defendant's father arrived to visit with M.B. On another occasion, when M.B. was eight months old, Donna and her mother-in-law arrived at Buttry's house with gifts for M.B. on Valentine's Day. According to Donna, Melissa answered the door and was angry, and Donna had no contact with her son's family after that visit for 1½ years.

¶ 123  Donna testified that, at some point, Melissa reinitiated contact, and she began seeing them more often, but she was still not allowed to see her son without Melissa being present. In addition, after marrying Melissa, the defendant no longer fished or hunted with his father, which they had done frequently prior to the marriage. Donna felt that they were "cut off."

¶ 124  Donna testified that after the defendant was arrested, she had a conversation with Melissa during which Melissa told her that she thought the defendant had been molested in Donna's home. Donna denied that the defendant had been molested, and Melissa responded that Donna did not know what her spouse does.

¶ 125   At the conclusion of the trial, the jury returned verdicts of guilty on five counts of predatory criminal sexual assault, three counts involving M.B. and two counts involving K.B. The State dismissed one of the counts involving K.B. The circuit court sentenced the defendant to natural life in prison. The defendant appeals.

¶ 126                                    ANALYSIS

¶ 127   The defendant has challenged three of the circuit court's evidentiary rulings in which the court barred him from presenting certain testimony that he argues was crucial to his defense. He argues that these rulings resulted in a denial of his constitutional right to a meaningful opportunity to present a complete defense.

¶ 128   "A defendant's right to a fair trial is a fundamental liberty interest secured by the sixth and fourteenth amendments to the United States Constitution." *People v. Peeples*, 205 Ill. 2d 480, 527, 793 N.E.2d 641, 670 (2002). The test for determining whether a defendant's due process right to a fair trial has been compromised is the same as the second prong of the plain error rule; "[w]e ask whether a substantial right has been affected to such a degree that we cannot confidently state that defendant's trial was fundamentally fair." *People v. Blue*, 189 Ill. 2d 99, 138, 724 N.E.2d 920, 941-42 (2000). The "harmless error doctrine" does not apply in cases where we cannot confidently say that the defendant's trial was fundamentally fair. *Id*. at 137-38, 724 N.E.2d at 940. Instead, when a defendant has been denied his constitutional right to a fair trial, we "must take corrective action so that we may preserve the integrity of the judicial process." *Id*. at 138, 724 N.E.2d at 941-42.

¶ 129 We also note that a defendant's right to a fair trial encompasses a due process right to "a meaningful opportunity to present a complete defense." *California v. Trombetta*, 467 U.S. 479, 485 (1984); *People v. Ramirez*, 2012 IL App (1st) 093504, ¶ 43, 976 N.E.2d 513. The Supreme Court has cautioned that the right to the opportunity to present a complete defense "would be an empty one if the State were permitted to exclude competent, reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant's claim of innocence." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986).

¶ 130 In the present case, we agree with the defendant that the circuit court improperly excluded evidence that was relevant to his version of the facts and the credibility of his confession. The errors unfairly impaired his substantial right to fully present his defense to the jury "so it may decide where the truth lies." *Washington v. Texas*, 388 U.S. 14, 19 (1967). As explained in detail below, because of the trial errors, we cannot confidently state that the defendant's trial was fundamentally fair. Accordingly, we are obligated to order a new trial.

¶ 131                                           I.

¶ 132           Circuit Court Improperly Barred the Defendant's Expert Testimony

¶ 133 The first issue we address concerns the circuit court's pretrial ruling barring the expert testimony of a clinical psychologist, Dr. Daniel Cuneo. The defendant sought to admit the expert's testimony in support of his claim that he gave a false confession because of psychological pressure, manipulation, and suggestion by Melissa and Buttry. We agree with the defendant that the circuit court erred in barring this expert testimony.

44

¶ 134 In pretrial discovery disclosures, the defendant described Dr. Cuneo's proposed testimony as follows: "Dr. Cuneo has examined the Defendant and from what Defense attorney has learned is that Dr. Cuneo found that Defendant[']s personality was such that he was subject to manipulation. Dr. Cuneo['s] opinion isn't that he was manipulated just that his personality profile shows a person who could be manipulated."

¶ 135 Prior to trial, the defendant filed a motion *in limine* seeking a pretrial ruling on the admissibility of Dr. Cuneo's testimony. In his motion, he alleged that he intended "to show that a confession that he gave in regards to the allegation in this case was the product of manipulation of him by his estranged wife and her mother." The defendant stated that Dr. Cuneo had reviewed the discovery in the present case, had interviewed him on three occasions, and "had conducted some test on [him]." He argued in his motion that Dr. Cuneo's testimony "would help the jury to understand how [his] psychological difficulties make him manipulated easily."

¶ 136 The defendant offered a letter authored by Dr. Cuneo as further explanation of his testimony. In the letter, dated November 12, 2012, Dr. Cuneo wrote that he interviewed the defendant on three occasions: November 10, 2011; November 30, 2011; and January 2, 2012. He administered the Minnesota Multiphasic Inventory-2 test and reviewed police reports; statements; and the defendant's letters, correspondence, and journal. He reviewed K.B.'s and M.B.'s interviews and Buttry's, Melissa's, and the defendant's videotaped interviews. He opined as follows:

> "It would be my opinion that [the defendant's] psychological difficulties would
>
> make him highly suggestible and easily led, especially in matters that would have

45

religious or sexual overtones. His thinking is very obsessive and rigid. He was extremely passive in matters relating to his past marriage and quick to acquiesce to the demands of suggestions of others. His history revealed that he could be easily manipulated, especially when placed under pressure by his estranged wife and mother-in-law."

¶ 137 In response, the State filed a motion *in limine* seeking to exclude Dr. Cuneo's testimony. The State argued that the subject matter on which Dr. Cuneo would testify was not one in which expert testimony is required. Therefore, the State concluded, his testimony was irrelevant and inadmissible.

¶ 138 In arguing for the admission of Dr. Cuneo's testimony, defense counsel noted that "there was a 5 day span between when the allegations were first made and [the defendant's] confession to Police." He contended that the defendant "was manipulated by his wife and her mother during this period of time." He noted that the only other evidence before the confession was from a three-year-old girl, who was under the supervision of his wife and mother-in-law. He concluded, "This makes Dr. Cuneo's testimony highly relevant in this cause." The defendant's counsel further explained that he did not intend to "ask Dr. Cuneo about an opinion regarding if [the defendant's] confession was voluntary or competent but [would] ask about [the defendant's] mental state or condition that makes him easily manipulated."

¶ 139 After hearing arguments on the admissibility of Dr. Cuneo's opinion testimony, the circuit court granted the State's motion *in limine* and excluded the testimony. The court did not articulate a specific basis for excluding the testimony but stated that its

decision was "[b]ased on argument and relevant case law." The defendant relied on Dr. Cuneo's November 12, 2012, letter as his offer of proof concerning the substance of his testimony if he were allowed to testify.

¶ 140 As stated above, we agree with the defendant that the circuit court abused its discretion in excluding this expert testimony.

¶ 141 In Illinois, a witness is generally permitted "to testify as an expert if his experience and qualifications afford him knowledge which is not common to lay persons and where such testimony will aid the trier of fact in reaching its conclusion." *People v. Enis*, 139 Ill. 2d 264, 288, 564 N.E.2d 1155, 1164 (1990). In determining whether to admit an expert's testimony, a trial court should determine the reliability of the expert's testimony by balancing the probative value of the evidence against its prejudicial effect. *People v. Lerma*, 2016 IL 118496, ¶ 23, 47 N.E.3d 985. The circuit court has broad discretion in determining the admissibility of an expert's testimony. *Enis*, 139 Ill. 2d at 290, 564 N.E.2d at 1165.

¶ 142 "[I]n the exercise of its discretion, the trial court should carefully consider the necessity and relevance of the expert testimony in light of the particular facts of the case before admitting that testimony for the jury's consideration." *Lerma*, 2016 IL 118496, ¶ 23, 47 N.E.3d 985. The supreme court "has held that expert testimony is only necessary when the subject is both particularly within the witness's experience and qualifications and beyond that of the average juror's, and when it will aid the jury in reaching its conclusion." *Id*. An expert's testimony is not admissible with respect to matters of

common knowledge "unless the subject matter is difficult to understand and explain." *People v. Gilliam*, 172 Ill. 2d 484, 513, 670 N.E.2d 606, 619 (1996).

¶ 143 "Generally, a decision on an evidentiary motion, such as a motion *in limine*, is committed to the trial court's discretion and a reviewing court will not disturb that decision absent an abuse of discretion." *People v. Nelson*, 235 Ill. 2d 386, 420, 922 N.E.2d 1056, 1075 (2009). Therefore, we review a trial court's decision to exclude an expert's testimony for an abuse of discretion. *Lerma*, 2016 IL 118496, ¶ 23, 47 N.E.2d 985. An abuse of discretion occurs when the trial court's decision is "arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." *People v. Rivera*, 2013 IL 112467, ¶ 37, 986 N.E.2d 634.

¶ 144 In the present case, in analyzing whether the circuit court abused its discretion in excluding this testimony, we turn to the supreme court's analysis in *Gilliam.* Although *Gilliam* is distinguishable from the present case, it offers us some guidance in our analysis.

¶ 145 In *Gilliam*, a defendant charged with murder, kidnapping, and robbery confessed during a police interrogation. *Gilliam*, 172 Ill. 2d at 497, 670 N.E.2d at 612. The State presented evidence of the confession at trial, and a jury returned a verdict of guilty on each charge. *Id*. On appeal, the defendant argued that the circuit court erroneously limited the evidence he could present to the jury concerning the credibility and weight to be given to his confession. *Id*. at 512, 670 N.E.2d at 619. Specifically, he wanted to present the testimony of an examining psychologist who would opine that the "defendant's desire to protect his family made him especially susceptible to police pressures and created a

48

form of psychological compulsion to confess." *Id*. The defendant also wanted to present the psychologist's conclusion that his "confession was the product of psychological coercion." *Id.* However, prior to the trial, the court granted the State's motion *in limine* to limit the psychologist's testimony. *Id*. The trial court ruled that the psychologist "*could testify on defendant's mental state or condition*, but could not testify on the circumstances surrounding the voluntariness or competency of defendant's confession." (Emphasis added.) *Id*.

¶ 146  In analyzing the circuit court's ruling, the supreme court first noted that when the State presents evidence of a defendant's confession, the defendant has the right to present evidence to the jury that affects the credibility or weight to be given to the confession. *Id*. at 512-13, 670 N.E.2d at 619. Although a defendant's statement may be determined to be voluntary in a pretrial hearing, "the physical and psychological environment that yielded the confession can also be of substantial relevance to the ultimate factual issue of the defendant's guilt or innocence." *Crane*, 476 U.S. at 689.

¶ 147  The supreme court in *Gilliam* held that the trial court in that case ruled correctly when it prohibited the expert from testifying on the circumstances surrounding the voluntariness or competency of the defendant's confession but allowed the expert to testify about the defendant's mental state or condition. *Gilliam*, 172 Ill. 2d at 513, 670 N.E.2d at 619. With respect to the barred portion of the expert's testimony, the court stated, "[w]hether defendant falsely confessed to protect his family is not a concept beyond the understanding of ordinary citizens, and is not difficult to understand or explain." *Id*. The court added that the defendant "was not precluded from challenging the

49

credibility of his confession" and that the "jury could have reached the same conclusion as [the psychologist] based on the facts imparted through the testimony of other witnesses." *Id*. at 513, 670 N.E.2d at 619-20. The supreme court concluded that the trial court did not abuse its discretion in its evidentiary ruling. *Id*. at 513, 670 N.E.2d at 620.

¶ 148 In the present case, we believe Dr. Cuneo should have been allowed to testify about his opinion that the defendant's personality was such that he was subject to manipulation. In analyzing this issue, it is important to note that the defendant did not argue that he gave a false confession due to coercion during police questioning. He testified that he confessed due to false memories at the time of his confession. That fact distinguishes this case from *Gilliam*.

¶ 149 The State's evidence of the defendant's guilt was based largely on the videotaped confession that he gave to Detective O'Neill, as well as the testimony of Melissa and Buttry. Although M.B. testified at trial, the substance of her testimony was understandably limited due to her age at the time of trial (5) as well as her age at the time of the alleged abuse (1 to 3½). M.B.'s testimony before the jury was not consistent with the more detailed hearsay statements she allegedly made as described by Melissa and Buttry. The defendant's videotaped confession, however, was over an hour and included his admissions to details of the abuse that were consistent with Buttry's and Melissa's testimony and included additional details to which Melissa and Buttry did not testify. M.B. and K.B.'s treating physician described physical symptoms for which she treated both children that were consistent with possible abuse but were also consistent with other innocent explanations.

50

¶ 150 The defendant's defense was based entirely on his assertion that he was psychologically manipulated by Buttry and Melissa into falsely believing that he had abused his children, which, in turn, resulted in him giving a false confession to Detective O'Neill. According to the defendant, strong religious beliefs and sexual overtones were central aspects of the psychological manipulation and suggestion that occurred throughout the marriage and that were intensified by Melissa and Buttry in the five days leading up to his confession.

¶ 151 The defendant testified that when Buttry and Melissa initially confronted him with accusations of abuse, he continually denied that it occurred. However, by the time of his confession to Detective O'Neill, he had come to believe that he had committed the acts of abuse. According to the defendant, after his arrest and separation from Buttry and Melissa's pressure and influence, he realized that he had no actual memory of committing any of the abuse and that his confession was based on false memories.

¶ 152 The defendant explained that Melissa mentally and physically abused him throughout their marriage prior to accusing him of abusing their children. He told the jury how, during their marriage, Melissa continually made false accusations that he had a problem with being lustful and that she became violent with him if he denied the accusations. She accused him of having lustful thoughts from things such as magazines, television advertising, children's books, and toys. He described to the jury a controlling and manipulative environment stemming from Melissa's alleged obsession with lust issues, which resulted in him questioning his understanding of his own thoughts and memories prior to ever being accused of child molestation.

51

¶ 153 The defendant told the jury that once Melissa and Buttry began accusing him of molesting his daughters, they were persistent with their accusations, told him what he had done in detail, and continually told him that he needed to be honest so that the children could get counseling, he could save his marriage, and he could get right with God. He explained to the jury how religious beliefs (his, Buttry's, and Melissa's) were a central focus of their lives and that both Buttry and Melissa, at times, claimed to have a special power from God, the power of discernment, which allowed them to see things that others cannot see. He testified that he believed that Buttry had the God-gifted power of discernment and that part of him thought that Melissa's claim to have the same power of discernment might be "legit."

¶ 154 He testified that, under their psychological pressure, he ultimately started questioning his own memory, started believing the visions placed in his mind by their accusations and descriptions, and was led to believe that he had committed the abuse through their suggestion and manipulation. He told the jury that, when he confessed, he was operating under these false memories and that the details he gave to Detective O'Neill were the details that were fed to him by Melissa and Buttry or that he made up during the confession.

¶ 155 We must "carefully consider the necessity and relevance of the expert testimony in light of the facts in the case." (Internal quotation marks omitted.) *People v. Allen*, 376 Ill. App. 3d 511, 522, 875 N.E.2d 1221, 1230 (2007). In addition, evidence is relevant when it tends to prove a fact in controversy or render a matter in issue more or less probable. *In re A.W.*, 231 Ill. 2d 241, 256, 897 N.E.2d 733, 742 (2008). In the present case, when Dr.

52

Cuneo's proposed testimony is carefully considered in light of the defendant's evidence described above and the standard for admitting expert testimony, we believe that it is apparent that Dr. Cuneo's proposed testimony meets the requirements for admission and is relevant to the defendant's defense.

¶ 156  Dr. Cuneo opined that the defendant's "psychological difficulties would make him highly suggestible and easily led, especially in matters that would have religious or sexual overtones." The defendant's confession involved both of these overtones, and he wanted to present the doctor's testimony to support his defense that his confession was not credible because it was the product of manipulation. Dr. Cuneo believed that the defendant "could be easily manipulated, especially when placed under pressure by his estranged wife and mother-in-law."

¶ 157 We believe Dr. Cuneo's testimony would be helpful to the jury in its task of evaluating the effect of the psychological environment that the defendant claimed yielded his confession. The psychological environment that the jury had to consider in this case was not simply the conditions inside the police interview room as is the case with many false confession claims. Instead, based on the defendant's testimony, the psychological environment that the jury had to consider included the alleged pressure and suggestion by Melissa throughout their marriage and by both Melissa and Buttry over the five days leading up to the day he voluntarily entered the police station and confessed to the abuse. We believe that expert testimony would have aided the trier of fact in evaluating the credibility of the defendant's confession and was relevant "to the ultimate factual issue of the defendant's guilt or innocence." *Crane*, 476 U.S. at 689.

¶ 158 Although we believe that *Gilliam* is distinguishable from the specific issue before us in the present case, we also believe that *Gilliam* offers some guidance in how we should analyze the issue. In *Gilliam*, the supreme court's analysis suggests that the trial court did not abuse its discretion when it ruled that the defendant's expert psychologist could testify about the "defendant's mental state or condition" as it related to his confession. In the present case, according to defense counsel, Dr. Cuneo was not going to offer a direct opinion concerning whether the defendant's confession was, in fact, false. Instead, similar to the expert's testimony in *Gilliam*, Dr. Cuneo would have opined that the defendant could be easily manipulated, especially when placed under pressure by his estranged wife and mother-in-law with respect to issues involving religious and sexual overtones. The doctor's testimony, therefore, would have aided the jury in evaluating the credibility of the defendant's claim that he falsely confessed due to false memories. Based on the supreme court's decision in *Gilliam*, we believe that this proposed testimony was proper and should not have been excluded by the circuit court.

¶ 159 Also, we note that nothing in the record suggests that the circuit court had concerns that Dr. Cuneo was unqualified or that his opinions were unreliable because of his methodology or that the scientific principles, upon which his opinions were based, were not generally accepted in the field of psychology. Therefore, exclusion of the testimony was an abuse of discretion.

¶ 160 Quoting *Gilliam*, 172 Ill. 2d at 513, 670 N.E.2d at 620, the State argues that "whether defendant falsely confessed because of pressures put to bear on him by his wife and mother-in-law could just as easily be 'based on the facts imparted through the

54

testimony of other witnesses.' " We disagree. A person confessing to a crime based on a false memory is behavior that is contrary to the average person's commonsense assumptions and is not a matter of common knowledge. We believe that a rational juror would not readily understand why an innocent defendant might falsely believe he had committed a crime. Expert testimony related to the defendant's psychological makeup as it relates to the environment leading up to his confession might aid the trier of fact in understanding the defense and in evaluating the credibility of his confession.

¶ 161  In *United States v. Hall*, 93 F.3d 1337, 1339 (7th Cir. 1996), a defendant convicted of kidnapping and murder argued that the trial court erred in excluding expert testimony that would have supported his claim that his confession was false. In that case, the defendant's entire defense "boiled down to a simple proposition: due to a personality disorder that makes him susceptible to suggestion and pathologically eager to please, he 'confessed' to a crime that he did not really commit, in order to gain approval from the law enforcement officers who were interrogating him." *Id*. at 1341. The defendant wanted to present testimony from a psychologist and a psychiatrist about false confessions. *Id.* In reversing the defendant's conviction and remanding for a new trial, the court noted that, although the trial court determined that the defendant's confession was voluntary, it was within the jury's province to assess the truthfulness and accuracy of the confession. *Id*. at 1344.

¶ 162 With respect to the psychologist, the defendant wanted him to testify about the existence of false confessions, that individuals can be coerced into giving false confessions, and that certain indicia can be identified to show when false confessions are

55

likely to occur. *Id.* at 1341. The trial court excluded the psychologist's testimony because the psychologist would have to judge the credibility of the officers who interrogated the defendant and because the testimony "would add nothing to what the jury would know from common experience." *Id.*

¶ 163  The *Hall* court disagreed, noting that the testimony would have assisted the jury in making its decision "because juries are unlikely to know that social scientists and psychologists have identified a personality disorder that will cause individuals to make false confessions." *Id.* at 1345. The court added, "It would have been up to the jury, of course, to decide how much weight to attach to [the expert's] theory, and to decide whether they believed his explanation of [the defendant's] behavior or the more commonplace explanation that the confession was true." *Id.* "But the jury here may have been deprived of critical information it should have had in evaluating [the defendant's] case." *Id.* The court emphasized that the expert's testimony went to the heart of the defendant's defense.

¶ 164  With respect to the psychiatrist's testimony in *Hall*, the trial court allowed him to testify about the defendant's mental condition. The defendant, however, wanted the psychiatrist to also testify about his "susceptibility to various interrogation techniques, the propriety of suggesting answers to [him], and [his] capability of confessing to a crime that he did not commit." *Id.* at 1341. The trial court excluded this testimony because "the jury could appreciate whether police interrogation techniques were suggestive by themselves" and because "[the psychiatrist's] testimony would invade the prerogative of the jury to assess [the interrogating officers'] credibility." *Id.*

¶ 165 Again, the *Hall* court disagreed with this aspect of the trial court's ruling. The court held that the psychiatrist was properly allowed to testify about the defendant's mental condition and that, in his opinion, it would be difficult to obtain reliable answers from the defendant during an interrogation because he was easily led. *Id*. at 1345. The court further held that, in a new trial, the psychiatrist should be allowed to further testify "about [the defendant's] susceptibility to various interrogation techniques and his propensity to give a false confession." *Id*.

¶ 166 We find *Hall* to be persuasive. In the present case, the defendant's challenge to the credibility of his confession lies at the center of his defense. As noted above, Dr. Cuneo's proposed testimony could have aided the jury in deciding whether the defendant gave a false confession based on a false memory. As in *Hall*, it is, of course, up to a jury to decide what weight to give to Dr. Cuneo's testimony in evaluating the defense, but to prevent him from testifying may have deprived the jury of critical information necessary for it to properly perform its function.

¶ 167 In *Crane*, 476 U.S. at 688, the United States Supreme Court held that evidence of the manner in which a confession was obtained may be highly relevant to the confession's reliability and credibility and should be admitted independent of any question of voluntariness. "[T]he physical and psychological environment that yielded the confession can also be of substantial relevance to the ultimate factual issue of the defendant's guilt or innocence." *Id*. at 689. The Court stated that voluntary confessions "are not conclusive of guilt," and "a defendant's case may stand or fall on his ability to

57

convince the jury that the manner in which the confession was obtained casts doubt on its credibility." *Id*.

¶ 168 *Crane* did not involve an expert's opinion with respect to a defendant's psychological makeup but focused on the physical and psychological aspects of a police interrogation. Nonetheless, we believe that the Court's analysis is relevant in considering the admissibility of expert testimony of the psychological makeup of a defendant who claims to have confessed due to a false memory. The crucial inquiry should be whether the proposed testimony will aid the jury in determining the defendant's guilt, and as we noted above, Dr. Cuneo's testimony goes to the heart of the defendant's defense with respect to the reliability and credibility of his confession and would aid the jury in considering issues that are beyond the understanding of the average juror. A false confession of the sort the defendant claims constitutes counterintuitive behavior that is not within the ordinary person's common understanding, and thus expert assistance might help the jurors understand how and why a defendant might confess under the circumstances he faced. The exclusion of such expert testimony could have hindered the jury in its task and prevented it from intelligently determining the issues it was charged with deciding.

¶ 169 We note that other states have also recognized that false confessions are counterintuitive and that expert testimony can be helpful to a jury in evaluating such a defense. For example, in 2013, the Supreme Court of Utah stated, "A confession, much like an eyewitness identification, is more or less reliable based on a number of factors. Unfortunately, however, research has shown that the potential infirmities of confessions

are largely unknown to jurors." *State v. Perea*, 2013 UT 68, ¶ 68, 322 P.3d 624. The court observed, "Just as the criminal law is 'rife with instances of mistaken identification,' [citation] '[i]t is beyond dispute that some people falsely confess to committing a crime that was never committed or was committed by someone else.' [Citation.]" *Id.* ¶ 69. "And like expert testimony regarding eyewitness identification, expert testimony about factors leading to a false confession" can assist the jury in understanding the evidence or determining a factual issue. *Id.*

¶ 170 In support of the circuit court's ruling, the State relies on *People v. Wood*, 341 Ill. App. 3d 599, 793 N.E.2d 91 (2003). In that case, a defendant convicted of predatory criminal sexual assault argued that the trial court improperly barred expert testimony concerning his susceptibility to police suggestion and coercion. The defendant had confessed to the sexual assault during interviews conducted by a police detective and an assistant State's Attorney. *Id.* at 601-02, 793 N.E.2d at 94. The defendant maintained that his confessions were false and that he did not commit the sexual assault. The trial court granted the State's motion to bar the defendant from presenting expert testimony about his state of mind, depression, and susceptibility to coercion. *Id.* at 602-03, 793 N.E.2d at 95.

¶ 171 In his brief on appeal, the defendant in *Wood* argued that the expert "would have testified that defendant is easily intimidated and that intimidation caused him to confess to a crime he did not commit." *Id.* at 608, 793 N.E.2d at 99. The *Wood* court, however, did not decide the defendant's appeal based on the merits of his argument. Instead, it held that the defendant waived his argument by failing to make an adequate offer of proof. *Id.*

at 604, 793 N.E.2d at 96. In so holding, the court explained that "[a]n offer of proof allows a reviewing court to determine whether evidence was properly excluded." *Id*. The court defined an "adequate offer" as one that "reveals, with particularity, the substance of the witness's anticipated answer." *Id*. An offer of proof is not adequate if it fails to establish "to both the trial and reviewing courts the admissibility of the testimony." *Id*. Because the defendant in *Wood* failed to make an adequate offer of proof, the court declined to decide his appeal on its merits. *Id*. at 608, 793 N.E.2d at 99.

¶ 172  After determining that the defendant made an inadequate offer of proof, the *Wood* court, in *dicta*, noted that the defendant's argument on appeal was "unpersuasive." *Id*. The court stated that the expert's testimony "that defendant was easily coerced and susceptible to intimidation is not beyond the understanding of ordinary citizens, nor is the concept difficult to understand." *Id*. at 608, 793 N.E.2d at 100. The court concluded that the "jury could have reached the same conclusion as [the doctor] based on defendant's testimony." *Id*.

¶ 173  Under the facts of the present case, we do not find the *Wood* court's *dicta* analysis to be persuasive. The focus of the court's analysis in deciding the case was the defendant's failure to make an adequate offer of proof, which impaired the court's ability to "determine whether evidence was properly excluded." *Id*. at 604, 793 N.E.2d at 96. The *Wood* court, nonetheless, attempted to analyze the merits of the defendant's argument based on a record that it had already concluded was inadequate for the task. Because of the inadequate record, the *Wood* court's conclusion that the defendant's

argument was "unpersuasive" carries no precedential value in analyzing the facts and issues of the present case.

¶ 174  In addition, *Wood* is distinguishable. In *Wood*, the defendant maintained that he knowingly gave a false confession because of coercive tactics on the part of interrogators. He testified that an interrogator threatened him with "the maximum penalty" if he did not confess and told him that it was in his best interests to tell him what he wanted to hear. *Id*. at 602, 793 N.E.2d at 95. On appeal, the defendant argued that he wanted to present expert testimony to show that his "confession was not voluntary" because he was intimidated by the interrogators. *Id*. at 608, 793 N.E.2d at 99. To the extent that the *Wood* court's analysis is relevant, it stands only for the proposition that the expert's testimony that the defendant "was easily coerced and susceptible to intimidation is not beyond the understanding of ordinary citizens, nor is the concept difficult to understand" (*id*. at 608, 793 N.E.2d at 100).

¶ 175  In the present case, the defendant's defense bears very little resemblance to what we can glean from the inadequate offer of proof offered by the defendant in *Wood*. In the present case, the defense is not based on a claim that the defendant knowingly gave a false confession because he was intimidated or coerced during a police interrogation. Instead, his claim is that he *voluntarily* gave a confession, believing at the time that it was true, while under the influence of false memories created by psychological manipulation. Unlike *Wood*, a person confessing to crimes that he did not commit because of false memories is not a concept within the understanding of ordinary citizens, nor is it a

61

concept that is easy to understand. As we stated above, it is counterintuitive that a person would falsely remember committing a crime that did not occur.

¶ 176 The State argues that Dr. Cuneo's testimony was properly excluded because he did not diagnose the defendant as having any particular psychological or personality disorder. We do not believe that this fact is a sufficient basis for excluding the expert's testimony in this case. In assessing the defendant's defense, the jury was not required to find that the defendant had a psychological or personality disorder before it could find that his confession was not credible. The significance of Dr. Cuneo's failure to diagnose the defendant with a psychological or personality disorder is certainly a matter that is proper for the jury to consider in evaluating the credibility of the defendant's claim. It is not a basis for excluding Dr. Cuneo's testimony from the jury's consideration.

¶ 177 The State correctly notes that the *Wood* court distinguished *Hall* by noting that, in *Hall*, "the defendant's alleged false confession was based on a diagnosed personality disorder." *Id*. (citing *Hall*, 93 F.3d at 1341). For the reasons noted above, we do not find the *Wood* court's attempt to distinguish *Hall* in its *dicta* analysis to be persuasive in analyzing the admissibility of Dr. Cuneo's testimony in the present case.

¶ 178 For these reasons, under the facts of this case, we believe that the circuit court's refusal to allow the defendant to present Dr. Cuneo's testimony was an abuse of discretion and deprived the defendant of his right to a fair trial. The testimony would have aided the jury in assessing the credibility of the defendant's confession, which was a crucial part of the prosecution's case against him. Accordingly, we must reverse the defendant's convictions and sentence and remand for a new trial because of this error.

62

¶ 179                              II.

¶ 180          Circuit Court Improperly Excluded Relevant Testimony as Hearsay

¶ 181   The defendant also argues that the circuit court improperly excluded the testimony of two witnesses who would have corroborated his testimony that Melissa claimed to have a supernatural power of discernment and was obsessed with making false accusations of lust. The defendant argues that this testimony was important in proving that he gave a false confession because of a psychological environment that included Melissa's manipulation, suggestion, and coercion.

¶ 182   After the State rested, and before the defendant began presenting his defense, the State made an oral motion *in limine* to preclude him from presenting the testimony of two witnesses: Ed Huebner and David VanHeusen. The circuit court granted the motion and barred their testimony. The State defends the court's ruling with arguments that are based on a conclusion that the proposed testimony was "blatant hearsay." The defendant argues that the proposed testimony was not hearsay. We agree with the defendant.

¶ 183   The defendant presented Huebner's and VanHeusen's proposed testimony during an offer of proof outside the presence of the jury. Huebner testified that he knew Melissa and that she had told him that she had a supernatural power of discernment. Specifically, he testified that she told him about an incident that occurred at a religious service when she was in college as follows:

> "[A]t a particular function there she went to the front, to the altar for prayer, and
> while there she felt someone's hand on her shoulder. She said when that hand
> touched her she could instantly feel the sexual immorality within that person and

63

she had the discernment of knowing that that person was evil sexually. When she turned to see who that person was, it was her then fiancé, David [VanHeusen]."

¶ 184 VanHeusen testified in the offer of proof that he did not know the defendant and had never met him but that he had known Melissa since the seventh grade. They began dating their sophomore year in high school and became engaged in 2001. He described incidents that occurred when they were together in which she accused him of having problems with lust and claimed that God had told her that he needed to work on his problem. His testimony was similar to the defendant's testimony with respect to Melissa controlling various aspects of his life and making repeated accusations of lustful thoughts. His testimony included descriptions of her anger and an incident involving violence when she believed God had told her that he had looked at other women behind her back, but he would not admit to her accusation.

¶ 185 VanHeusen told the jury about an incident when he and Melissa were in college and attended a chapel service together. He stated that, after the service, Melissa stopped him and told him that God told her something about him that needed to change. He testified that she told him that he needed to work on his problem with lust in order for them to progress in their relationship. He testified that she told him that he had problems with thinking of other women, wanting to be with other women, and accused him of having sexual thoughts about other women when he saw them.

¶ 186 VanHeusen explained that Melissa created rules for him during their relationship stemming from her accusations of him having lust issues. Her rules and restrictions included a requirement that he keep his eyes straightforward when he walked and not

64

look around. If he was in a car, he was not allowed to look into the rearview mirror. He testified that she did not want him looking at billboards because she believed that if he were to see another woman, his sexual thoughts would hinder their relationship.

¶ 187  According to VanHeusen, Melissa told him that she knew he was having these thoughts because God told her. He testified, "specifically she would tell me that she discerned that I was doing things behind her back, that even when I was with her I was thinking about her friends, I was lusting after her friends, wanting to have sex with her friends." He said that because he would not "admit to certain things," if he was not with her, she wanted him to be in his dorm room surrounded only by guys that she knew. She instructed him to break off many of his friendships, and, in one instance, she listened outside a room when he told a friend that he could not see him anymore, making sure he said all the things that she wanted him to say.

¶ 188  VanHeusen testified that Melissa told him that he needed to be fixed by confessing to her everything that he had done and by admitting to all of the things of which she was accusing him. He would not admit to her accusations, and he said "that would infuriate her because she had knowledge from God that that is what was going on." He explained that he complied with her rules because he was in love with her and would have done anything that she wanted him to do.

¶ 189  VanHeusen described an event that occurred when he returned home after spending the day with Melissa. After they had parted ways, he returned to his house and sat down to watch a movie. He testified, "[A]t that point I just kind of sat−I describe it as an Al Bundy moment, where I just sat my hand in my pants like this, and as soon as I did

that there was a knock on my window and Melissa was outside my window." He let her inside, and she began accusing him of masturbating.

¶ 190 VanHeusen described another occasion during the summer of 2001, when Melissa was happy because he was complying with her demands. She called him to come over to her house, which was a 10-minute drive. When he arrived, she was no longer happy but was angry because, she said, God had told her what he had done. VanHeusen told her that he came straight to her house so he could not have done anything, but she insisted that he had to tell her the truth. She told him that God had told her that he looked at another woman in a green car on the drive to her house and that he began lusting after her. He testified that when he would not admit to her accusation, "it infuriated her." According to VanHeusen, she punched him in the chest and neck and told him that he needed to confess. When he continued to refuse to admit to her accusation, she punched him in the mouth. He grabbed her hand and told her that she was not going to punch him anymore. She broke down and started crying, and, by the next weekend, they mutually agreed to end their relationship.

¶ 191 The State moved to bar Huebner's and VanHeusen's testimony on the basis that their testimony was improper impeachment evidence and involved collateral matters. The State argued that Melissa was cross-examined on the topic of discernment and that the defendant could testify about the topic, but because the issue was not a material issue, the defendant should not be allowed to call additional witnesses to say the opposite of what Melissa testified on the issue. In addition, the State argued that the evidence was hearsay. At the conclusion of the offer of proof, the circuit court clarified that it was barring the

66

testimony "pursuant to the hearsay nature portion of the testimony, the fact that she is the mother of the victim in this case, and pursuant to *People v. Santos* and case law noted in that case." On appeal, the State argues that the circuit court properly excluded this evidence because it was hearsay, was not admissible as a prior inconsistent statement, and was not admissible as impeachment evidence as it concerned a collateral matter.

¶ 192 In analyzing the admissibility of this evidence, we first determine whether the proffered testimony constitutes hearsay evidence. Although a trial court's evidentiary rulings are generally reviewed under the abuse of discretion standard, a ruling on whether a statement is hearsay is reviewed *de novo* when the determination does not involve fact finding or the credibility of witnesses. *People v. Steele*, 2014 IL App (1st) 121452, ¶ 34, 19 N.E.3d 1084.

¶ 193 Rule 801 of the Illinois Rules of Evidence defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ill. R. Evid. 801(c) (eff. Jan. 1, 2011). A statement is a written or oral "assertion" by the person making the statement. *Id*. Therefore, our analysis focuses on whether the proffered testimony includes any "assertions" by Melissa that were offered by the defendant to prove "the truth of the matter asserted." In *People v. Carpenter*, 28 Ill. 2d 116, 121, 190 N.E.2d 738, 741 (1963), the supreme court explained this concept by describing a scenario involving "witness A testifying that 'B told me that event X occurred.' " If A's testimony is offered for the purpose of establishing that B said this, it is not hearsay−if offered to prove that event X occurred, it is hearsay. *Id*.

¶ 194  In the present case, the matters asserted in the out of court statements allegedly made by Melissa, and testified to by Huebner and VanHeusen, concern, in part, her claims to have a supernatural power from God to discern the lustful thoughts of other people, specifically her fiancé, VanHeusen. In addition, Melissa's out of court "assertions" also included accusations that she made to VanHeusen with respect to him lusting after other women during his relationship with and engagement to her. We agree with the defendant that this testimony was not offered to prove the truth of the matters that Melissa asserted in these statements.

¶ 195  The defendant did not intend to prove that Melissa did, in fact, have a supernatural power of discernment or that VanHeusen did, in fact, have a problem with lustful thoughts of other women while driving his car, looking at billboards, looking at Melissa's friends, or in any other circumstances. The defendant's defense was not based on the truth of these assertions made by Melissa. The defendant offered the testimony to prove that Melissa made the statements, not to prove the truth of the subject matter of the statements.

¶ 196  The rationale for the hearsay rule "is the lack of any opportunity for the adversary to cross-examine the absent declarant whose out-of-court statement is introduced into evidence." *Anderson v. United States*, 417 U.S. 211, 220 (1974). In the present case, because the defendant is not contending that anything Melissa said out of court with respect to VanHeusen was true, her credibility when she made the claim of having the power of discernment or when she accused VanHeusen of lustful thoughts is not at issue; the purpose for offering these statements does not depend on Melissa's truthfulness,

68

memory, or perception (with respect to her claim to supernatural powers or VanHeusen's thoughts) which are the core credibility concerns that lie behind the hearsay rule. See *United States v. Rodriguez-Lopez*, 565 F.3d 312, 314 (6th Cir. 2009).

¶ 197 In addition, many of Melissa's statements that are encompassed within VanHeusen's proposed testimony are not statements that propose a proposition that can be either true or false. Therefore, they are not "assertions." For example, Melissa ordering VanHeusen to keep his eyes forward, not to look around, not to look in his rear view mirror while driving, or not to look at billboards were statements that were not asserting propositions that could be true or false. See *United States v. Thomas*, 451 F.3d 543, 548 (8th Cir. 2006) ("[C]ommands generally are not intended as assertions, and therefore cannot constitute hearsay."); *Rodriguez-Lopez*, 565 F.3d at 314 ("[I]f the statements were questions or commands, they could not−absent some indication that the statements were code for something else−be offered for their truth because they would not be assertive speech at all. They would not assert a proposition that could be true or false.").

¶ 198 The defendant did not offer the statements Melissa made to VanHeusen to prove the truth of any matter that she asserted to VanHeusen. Instead, the defendant sought to introduce these out of court statements only to prove the proposition that she made the statements, making it more likely that she also made similar statements to him under similar circumstances. Therefore, the proposed testimony fell outside the definition of hearsay, and the circuit court should not have barred the testimony as impermissible hearsay.

69

¶ 199 Furthermore, the evidence was relevant to the defendant's defense. Evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. *In re Elias*, 114 Ill. 2d 321, 334, 499 N.E.2d 1327, 1332 (1986). "This definition *** encompasses the materiality of evidence as well as its probative value." *Id.* Materiality "refers to the relationship a particular proposition bears to the ultimate determination of the action." *Spencer v. Wandolowski*, 264 Ill. App. 3d 611, 617, 636 N.E.2d 854, 858 (1994). Probative value "refers to the tendency of the evidence to render a particular proposition more or less probable than it would be without the evidence, and is determined by testing the proffered fact against 'the light of logic, experience and accepted assumptions as to human behavior.' " *Id.* (quoting *Marut v. Costello*, 34 Ill. 2d 125, 128, 214 N.E.2d 768, 769 (1965)). Relevancy of evidence is not an inherent characteristic but is a relationship between an item of evidence and a matter properly provable in the case. *People v. Monroe*, 66 Ill. 2d 317, 322, 362 N.E.2d 295, 297 (1977).

¶ 200 In his brief, the defendant succinctly describes the relevance of Huebner's and VanHeusen's testimony as follows: "The parallels between Melissa's relationship with [the defendant] and Melissa's relationship with *** VanHeusen not only give credibility to the otherwise strange and bizarre relationship that [the defendant] and Melissa shared, but they go to the very heart of his defense: that he was manipulated into giving a false confession for criminal acts he did not commit." See *People v. Banks*, 192 Ill. App. 3d 986, 993-94, 549 N.E.2d 766, 771 (1989) (evidence that two police officers used physical coercion against another suspect "tends to show the conduct that these two police officers

employ \*\*\*, and such evidence is therefore probative as to the conduct they employed in the present case").

¶ 201 Whether Melissa made certain statements to the defendant lies at the heart of his claim that he gave a false confession because of a coercive environment that existed during their marriage. As noted above, it is the fact that Melissa made the statements, not the truth of the statements, that is relevant to the defense. Accordingly, the circuit court should not have barred the testimony as impermissible hearsay.

¶ 202 In addition to hearsay, the circuit court also cited *People v. Santos*, 211 Ill. 2d 395, 813 N.E.2d 159 (2004), as a basis for excluding this evidence. *Santos* involved application of section 115-7 of the Code (725 ILCS 5/115-7 (West 2014)), commonly known as the "rape shield" statute. The rape shield statute concerns the admission or exclusion of "prior sexual activity or the reputation of the alleged victim or corroborating witness." 725 ILCS 5/115-7 (West 2014).

¶ 203 The defendant in *Santos* was charged with aggravated criminal sexual abuse. *Santos*, 211 Ill. 2d at 398, 813 N.E.2d at 160. He wanted to cross-examine the 16-year-old victim regarding inconsistent statements she made to the authorities, specifically, that she had told authorities that she had not had sexual intercourse with anyone other than the defendant in the previous 72 hours. Later, however, DNA tests revealed that semen recovered from the victim could not have been from the defendant, and the victim admitted that she had engaged in sexual intercourse with another person. *Id.* at 399-400, 813 N.E.2d at 161.

71

¶ 204 The *Santos* court held that the rape shield statute applied because the proposed evidence revealed the complainant's prior sexual activity and did not fit within either of the two exceptions listed in the statute. *Id*. at 402-03, 813 N.E.2d at 163. The court also noted that the defendant wanted to impeach the victim's credibility with a specific act of untruthfulness, which was prohibited in Illinois. *Id*. at 405, 813 N.E.2d at 164.

¶ 205 In the present case, Huebner's and VanHeusen's proffered testimony does not invoke the rape shield statute as the testimony does not involve past sexual conduct or the reputation of a victim or complainant. In addition, the proffered evidence's relevancy is not simply that it impeaches Melissa's in court testimony. Instead, the testimony is relevant as substantive circumstantial evidence that Melissa made certain statements to the defendant. As noted above, whether Melissa made statements to the defendant involving religious and sexual overtones lies at the heart of the defendant's claim that he made a false confession. *Santos* offers no guidance in determining the admissibility of the proffered evidence.

¶ 206 Also, we agree with the defendant that the proffered testimony was not too remote in time to be admissible. The proffered testimony involves actions and statements on the part of Melissa directed at her then fiancé, to whom she was engaged prior to becoming engaged to the defendant. The timeframe in which the proffered statements were made is a matter for the jury to consider in weighing their relevance.

¶ 207 Citing section 115-10.1 of the Code (725 ILCS 5/115-10.1 (West 2014)), the State argues that the defendant did not, and could not, lay the foundation for the proffered testimony to come in as substantive evidence. Section 115-10.1, however, concerns the

admission of certain testimony as an exception to the hearsay rule when the testimony is a prior inconsistent statement and meets certain criteria for admission. As noted above, the proffered testimony of Huebner and VanHeusen is not hearsay. Therefore, the foundation requirements for the admission of prior inconsistent statements as an exception to the hearsay rule contained in section 115-10.1 are irrelevant to the admissibility of Huebner's and Van Heusen's testimony.

¶ 208 Because the proffered testimony of Huebner and VanHeusen is not hearsay, the circuit court improperly barred the testimony on that ground. In addition, the circuit court's erroneous refusal to allow the defendant to present this testimony contributed to the unfairness of the trial because, if believed by the jury, it could lend some credibility to his defense. Therefore, this erroneous evidentiary ruling further supports a reversal of his convictions and remand for a new trial.

¶ 209                                              III.

¶ 210                     Circuit Court Improperly Excluded Testimony That
                        Melissa Falsely Accused Buttry's Ex-Husband of Abuse

¶ 211 The defendant also argues that the circuit court improperly excluded testimony that Melissa made false statements that Buttry's ex-husband, Dana McKee, had abused her. Specifically, the defendant wanted to present testimony that Melissa falsely told people that McKee had sexually abused her and had gone to jail for the abuse. The defense also wanted to present testimony that, in Buttry and McKee's divorce proceedings, Buttry falsely accused McKee of physically abusing her in order to gain leverage over him in their divorce. The defense theory was that this evidence was

73

relevant to show that Melissa had fabricated sexual abuse allegations to gain sympathy and acceptance in their church community, which frowned upon divorce except in cases involving adultery, and to gain leverage against the defendant because the marriage was failing and possibly headed toward dissolution.

¶ 212 The State filed a motion *in limine* to bar "evidence or allusions to the facts and circumstances surrounding the separation and divorce between" Buttry and McKee. During the hearing on the State's motion *in limine*, the defendant's attorney explained that testimony concerning allegations against McKee was relevant because Buttry was the first person who began questioning M.B. about possible abuse and making allegations that the defendant had abused M.B. According to the defense, McKee, a police officer in Michigan, would testify that Buttry "falsely accused him of abusing [Melissa] physically.[1] Not any sexual abuse or anything else to that matter. She went to his superiors to get what she wanted in a divorce." The defendant's attorney explained that both families involved were "highly religious" and that divorce was not "a thing that's spoken of lightly or accepted easily." The defendant's attorney stated that he also had witnesses who would state that "both Mary Buttry and Melissa Burgund told people themselves, out of their mouths that Dana McKee molested Melissa and was in prison for it." [2] He continued, "This was to gain acceptance into the church. *** This is their go-to

---

[1]In his offer of proof, the defendant's attorney stated that McKee would testify that Buttry accused him of physically abusing her, not Melissa.

[2]In his offer of proof, the defendant's counsel described only witnesses who would testify that Melissa made accusations that McKee abused her. He did not describe

thing. They go to child abuse. *** [A]nd these are people that are independent, not family members, nothing else, people that don't even know [the defendant]."

¶ 213  In response, the State told the court that both Melissa and Buttry would deny ever speaking to anyone about abuse by McKee. The circuit court granted the State's motion *in limine* and barred the testimony, stating that the proposed testimony was "a collateral issue." The court stated that it did not want to conduct a "mini trial" on the issue of whether Buttry and Melissa had falsely told other people that McKee had sexually assaulted Melissa.

¶ 214  During trial, the defendant made an offer of proof with respect to McKee-related testimony as follows:

"It is on information and belief that the defense believes that if [McKee] was called he would testify that it would have been approximately 30 years ago that he was married to Mary Buttry, that Mary Buttry made false allegations against him of abuse on her, not upon the child, that she went to his superior officers, and then she left and filed for divorce and had him sign off on the child that she was at that point carrying, and that there never was any allegations of sexual abuse against Melissa.

Further, your honor, I would present evidence through an Emily Dennal (phonetic) and through−she's going to testify, but not to this matter−through Donna Burgund and Michael Burgund that−that Melissa had claimed that she was

witnesses who would testify that Buttry said McKee abused Melissa.

75

in fact sexually abused by Dana McGee [*sic*] and that he went to jail for this, and that she's made that known around the area and told at least three people that I know of.

In fact−and then she−I would offer testimony that she gave a deposition in the divorce case in this matter in which she stated there never was any allegations, she just felt that she was in fact molested as a child herself, and that−and that there was never−you know, never any allegations against Dana McGee [*sic*] of that."

¶ 215 In response to the offer of proof, the circuit court noted as follows:

"The prior ruling stands on that. As to the motion for offer of proof, I will clarify that pursuant to the hearsay nature portion of the testimony, the fact that she is the mother of the victim of this case, occurred ten years ago, and pursuant to *People v. Santos* and case law noted in that case, the motion in *limine* is granted."

¶ 216 The circuit court has discretion in ruling on the admissibility of evidence, and we will not overturn an evidentiary ruling unless there has been an abuse of discretion. *People v. Nelson*, 235 Ill. 2d 386, 420, 922 N.E.2d 1056, 1075 (2009). An abuse of discretion occurs when the trial court's decision is "arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." *People v. Rivera*, 2013 IL 112467, ¶ 37, 986 N.E.2d 634.

¶ 217 The exact ground for barring the testimony is unclear from the trial court's ruling. The court may have considered the evidence as (1) hearsay, (2) specific act impeachment, and/or (3) collateral. In its brief, the State defends the circuit court's ruling by arguing that the proposed testimony "would have amounted to collateral impeachment evidence

76

that would have confused the jury and was not material to the question of the defendant's guilt." We will, therefore, focus on those bases for the court's ruling.

¶ 218 The defendant's proposed testimony with respect to McKee involves two distinct subject matters: (1) evidence that Buttry falsely accused him of physical abuse against her to gain an advantage in her divorce more than 30 years ago; and (2) evidence that Melissa made false statements that McKee had sexually abused her and gone to prison for the abuse. The defendant wanted to present this testimony to raise issues about the motives and credibility of two of the State's main witnesses, Buttry and Melissa.

¶ 219 With respect to the second subject matter, *i.e.*, whether Melissa falsely told others that McKee had sexually abused her, the State argues that this testimony was collateral because Melissa denied making any statements about McKee sexually abusing her and that the testimony was a "far swing away from the actual evidence and accusations made in the instant case." Therefore, the State continues, "the trial would almost assuredly devolve into a 'mini-trial' involving the foregoing two layers of collateralness, leaving the jury almost inevitably exhausted and confused and distracted."

¶ 220 "A matter will be deemed collateral if, but for the fact that it contradicts a statement of a witness, it would be inadmissible or, put another way, that its only relevance to the underlying action is that it constitutes an element of a witness' testimony." *People v. Abrams*, 260 Ill. App. 3d 566, 579, 631 N.E.2d 1312, 1322 (1994). Also, in analyzing the admissibility of this evidence, we note that Rule 608 of the Illinois Rules of Evidence (Ill. R. Evid. 608 (eff. Jan. 1, 2011)), states as follows:

77

"The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise."

¶ 221   In the present case, the defendant seeks to impeach Melissa's truthfulness with evidence of these specific instances of untruthfulness. Rule 608 does not expressly address this type of impeachment evidence. However, prior to the adoption of Rule 608 of the Illinois Rules of Evidence, we held that " 'specific-act impeachment is *prohibited* in Illinois.' " (Emphasis in original.) *Reichert v. Board of Fire & Police Commissioners*, 388 Ill. App. 3d 834, 846-47, 905 N.E.2d 861, 872 (2009) (quoting *Santos*, 211 Ill. 2d at 404, 813 N.E.2d at 163). We also note that Rule 608 of the Illinois Rules of Evidence differs significantly from Rule 608(b) of the Federal Rules of Evidence, which expressly allows cross-examination of witnesses concerning specific instances of the witness's conduct when the specific instances are "probative of the character for truthfulness or untruthfulness" of the witness. Fed. R. Evid. 608(b). Even under the federal rule, however, "[e]xcept for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness." *Id.*

¶ 222   The defendant acknowledges that Illinois courts have generally barred specific act impeachment, but he argues that the supreme court carved out an exception to this rule in

*People v. Cookson*, 215 Ill. 2d 194, 213-15, 830 N.E.2d 484, 495-96 (2005), and that this exception is applicable in the present case.

¶ 223 In *Cookson*, a defendant accused of predatory criminal sexual assault and aggravated criminal sexual abuse wanted to present (1) evidence from a DCFS caseworker that the victim had accused another person of sexual abuse, (2) evidence that that an administrative review reversed DCFS's finding that the claimed abuse against the other person was "indicated," and (3) testimony from the other person accused that he did not abuse the victim and that he believes that the victim made up the allegation because she was upset with him. *Id*. at 215-16, 830 N.E.2d at 496.

¶ 224 In analyzing the admissibility of this evidence, the supreme court reaffirmed its prior rule prohibiting the impeachment of a witness with specific past instances of untruthfulness. *Id*. at 213, 830 N.E.2d at 495. The court noted, however, that such evidence could be used to impeach a witness in other ways, such as if it showed bias, interest, or motive to testify falsely. *Id*. at 214, 830 N.E.2d at 495.

¶ 225 In *Cookson*, the defendant's proposed evidence did not show the victim's bias because the defendant was not linked in any way with the other accused. *Id*. at 216, 830 N.E.2d at 496. In addition, the evidence did not show an improper interest on the part of the accuser or a motive to lie about the defendant. *Id*. at 216, 830 N.E.2d at 497. The court concluded, "[T]he only relevant inference a jury could draw from the evidence of the abuse allegation against [the other person] and his explanatory denial would be that [the victim] lied about being abused by defendant, but this court has already specifically

rejected the use of evidence of specific past instances of untruthfulness to impeach a witness' truthfulness." *Id*.

¶ 226 Therefore, in the present case, we do not agree with the defendant that *Cookson* stands for the general proposition that a defendant accused of sexual assault may introduce evidence that the accuser has previously made false accusations of sexual assault in order to prove the victim's untruthfulness. Instead, the court held that such evidence could be admissible if it is relevant to show bias, interest, or motive of the witness.

¶ 227 In its analysis, the *Cookson* court cited *People v. Nicholl*, 210 Ill. App. 3d 1001, 569 N.E.2d 604 (1991), with approval. In that case, a defendant convicted of aggravated criminal sexual abuse argued that the trial court erred in refusing to admit evidence of the victim's subsequent false accusation against him. The proffered evidence involved a DCFS worker's conclusion that the victim's subsequent allegation of abuse was unfounded. *Id*. at 1010, 569 N.E.2d at 611.

¶ 228 The appellate court held that the trial court should have admitted the evidence, including testimony from the alleged victim's father stating that the child was not in the defendant's presence on the day in question, making it impossible for the uncharged abuse to have occurred. *Id*. at 1010-11, 569 N.E.2d at 611. In addition, there was evidence that the child's mother had repeatedly threatened to "get" the defendant and the child had "no independent recollection" of the subsequent incident of alleged abuse. *Id*. at 1008-09, 569 N.E.2d at 609.

¶ 229 In *Cookson*, the supreme court agreed with the result in *Nicholl* and discussed the reasoning as follows: "Taken together, [the evidence in *Nicholl*] suggests the five-year-old victim may have, *albeit* unwittingly, had some bias or motive not to tell the truth about the charged incident due to his custodial mother's hostile influence." (Emphasis in original.) *Cookson*, 215 Ill. 2d at 217, 830 N.E.2d at 497 (discussing *Nicholl*).

¶ 230 In the present case, the defendant cannot impeach Buttry's or Melissa's truthfulness with evidence of prior false statements about McKee unless this evidence shows bias, interest, or motive of the witnesses. The allegations of the abuse in the present case came to light based on conclusions Buttry and Melissa reached after questioning M.B. on multiple occasions, and the State presented their testimony describing M.B.'s out of court statements, which they gleaned from their questioning. They described the abuse M.B. allegedly reported in much greater detail than what M.B. testified to at trial or stated during the forensic interview. Accordingly, Buttry's and Melissa's credibility were undeniably at issue in this case, and the defendant was entitled to present evidence of their potential interest, bias, and motive in order to impeach their credibility. Therefore, we must review the defendant's proffered evidence to determine whether it was relevant to their bias, interest, or motive. The evidence must give rise to the inference that they had something to gain or lose by their testimony, and the evidence cannot be "remote or uncertain." *People v. Bull*, 185 Ill. 2d 179, 206, 705 N.E.2d 824, 838 (1998).

¶ 231 With respect to evidence that Buttry accused McKee of physical abuse as leverage in their divorce over 30 years prior to the defendant's alleged abuse, this evidence is too

speculative and remote to infer that Buttry had something to gain or lose by her testimony in the present case. Evidence that Buttry was biased or had a motive against McKee, and had an interest in a favorable outcome in her divorce from McKee, does not establish that she is biased or has a motive against the defendant or has an interest in her testimony in the criminal case against him. At best, it is merely evidence of past instances of untruthfulness offered to impeach Buttry's truthfulness, which the supreme court has held is improper impeachment. Therefore, we cannot say that the circuit court abused its discretion in barring this aspect of the proffered testimony.

¶ 232 However, the defendant also sought to present evidence that Melissa falsely stated that McKee had sexually abused her and that he had gone to prison for the abuse. Melissa's purpose in making these false statements, the defendant maintains, was to gain sympathy and acceptance of her family in their church community, which frowned upon divorce except in cases involving adultery.

¶ 233 We believe that the evidence was admissible as evidence of Melissa's potential motive, interest, and bias in testifying against the defendant. The evidence at trial included testimony that the marriage between the defendant and Melissa was tumultuous, with accusations of lust issues by Melissa directed at the defendant, physical violence stemming from lust accusations, an extramarital affair by Melissa, and discussions of divorce. Evidence that Melissa made false accusations of sexual abuse in the past, in order to gain acceptance in the church, as it related to a divorce, was relevant in establishing that she may have believed that she had something to personally gain from her testimony against the defendant.

¶ 234 Although conflicting, the evidence at trial included testimony that religious beliefs and the church were important to Melissa and that the church disfavored divorce except in cases of adultery. Much of the State's evidence against the defendant rested on Melissa's credibility when she told the jury about M.B.'s out of court statements. Evidence that Melissa had previously made untruthful allegations of sexual abuse in order to gain favor in their church could assist the jury in evaluating her credibility with respect to the allegations of abuse against the defendant, particularly in light of the marital difficulties that she and the defendant were experiencing at the time of the accusations. If believed by the jury, the evidence could suggest that Melissa had some bias or motive not to tell the truth about the charged incident. *Cookson*, 215 Ill. 2d at 217, 830 N.E.2d at 497.

¶ 235 In addition, we do not agree with the State that evidence suggesting that Melissa had bias, interest, or motive was a collateral matter. A criminal defendant is given wide latitude to establish a witness's bias, prejudice, or motive to testify falsely, particularly in the context of a criminal trial where the State's evidence depends on the witness's testimony. *Id.* at 215, 830 N.E.2d at 496. "[A]s in many if not most child sexual abuse cases, there was no testimony from third-party eyewitnesses," and there was no physical evidence linking the defendant to the alleged abuse. *Id.* Melissa's credibility, or lack thereof, lies at the heart of both the prosecution and the defense. Accordingly, we believe that the circuit court abused its discretion in barring this testimony.

¶ 236 The cumulative effect of all the circuit court's erroneous evidentiary rulings noted above resulted in the defendant being denied his constitutional right to a fair trial. For these reasons, we must reverse his convictions and sentence and remand for a new trial.

¶ 237                                    IV.

¶ 238              Circuit Court Properly Admitted M.B.'s Hearsay Statements

¶ 239 The final argument the defendant raised concerns the circuit court's admission of hearsay statements made by M.B. The defendant argues that the circuit court should not have allowed M.B.'s hearsay statements made to Buttry, Melissa, and the forensic interviewer, Mangiaracino. We disagree.

¶ 240 Although we find that the defendant is entitled to a new trial based on the erroneous evidentiary rulings analyzed above, we will, nonetheless, address this final argument concerning the circuit court's admission of M.B.'s hearsay statements because this is an issue that is likely to arise on remand. *People v. Ward*, 2011 IL 108690, ¶ 50, 952 N.E.2d 601.

¶ 241 The circuit court admitted M.B.'s hearsay statements pursuant to section 115-10 of the Code (725 ILCS 5/115-10 (West 2014)). Section 115-10 allows the admission of evidence as an exception to the hearsay rule in cases involving certain crimes, including predatory criminal sexual assault of a child. Section 115-10(a)(2) allows the admission of "testimony of an out of court statement made by the victim [under the age of 13] describing any complaint of [a physical or sexual act perpetrated upon or against that victim] or matter or detail pertaining to any act which is an element of an offense which is the subject of a prosecution for a sexual or physical act against that victim." 725 ILCS

5/115-10(a)(2) (West 2014). Section 115-10(b) further provides that the hearsay testimony is admissible if "[t]he court finds in a hearing conducted outside the presence of the jury that the time, content, and circumstances of the statement provide sufficient safeguards of reliability," and the child testifies at the hearing. 725 ILCS 5/115-10(b)(1)-(2) (West 2014).

¶ 242  "When conducting a reliability determination, a trial court evaluates the totality of the circumstances surrounding the making of hearsay statements." *People v. West*, 158 Ill. 2d 155, 164, 632 N.E.2d 1004, 1008-09 (1994). A trial court has considerable discretion in determining the admissibility of hearsay statements under section 115-10, and we will not disturb the lower court's finding absent an abuse of discretion. *Id*. at 164-65, 632 N.E.2d at 1009. In the present case, upon reviewing the record, we cannot say that the circuit court abused its discretion.

¶ 243  Initially, we note that the circuit court did not set forth its reasons for finding that the time, content, and circumstances surrounding M.B.'s statements provided sufficient safeguards of reliability for their admissibility at trial. However, the supreme court has held that trial courts are not required to state the reasons for such a finding. *Id.* at 164, 632 N.E.2d at 1008. In addition, "cases which involve the determination of the reliability of section 115-10 statements are fact specific," and the holdings in each case are *sui generis*. *People v. Edwards*, 224 Ill. App. 3d 1017, 1026, 586 N.E.2d 1326, 1332 (1992).

¶ 244  We also note that in analyzing the circuit court's ruling under section 115-10 of the Code, we must focus on the testimony admitted at the pretrial hearing rather than the testimony presented at trial. *People v. Stull*, 2014 IL App (4th) 120704, ¶ 85, 5 N.E.3d

328. In the present case, the witnesses' testimony at the pretrial hearing was consistent with their testimony at trial as set out in detail in the background section above.

¶ 245  At the conclusion of the section 115-10 hearing, the circuit court ruled to exclude M.B.'s statement, "It's all my fault," but added that the defendant could question Buttry about the statement on cross examination at trial, which he did. With respect to M.B.'s other hearsay statements made to Buttry, Melissa, and Mangiaracino, the court found that "the time, content, [and] circumstances of the statements indicate sufficient safeguard with reliability to allow the testimony pursuant to 115-10."

¶ 246  The defendant argues that M.B.'s out of court statements allegedly made to Buttry, Melissa, and Mangiaracino were improperly admitted under section 115-10. However, we cannot find that the circuit court abused its discretion in allowing the admission of this testimony.

¶ 247 Some factors that are important in determining whether the time, content, and circumstances of the statements provide sufficient safeguards of reliability include: "the child's spontaneous and consistent repetition of the incident, the child's mental state, use of terminology unexpected of a child of similar age, and the lack of motive to fabricate." *West*, 158 Ill. 2d at 164, 632 N.E.2d at 1009. The State bears the burden of establishing that the statements were "not the result of adult prompting or manipulation." *People v. Sharp*, 391 Ill. App. 3d 947, 955, 909 N.E.2d 971, 978 (2009).

¶ 248  The supreme court has noted that "the prosecution of cases involving sexual abuse of children always presents special problems of proof, the most obvious one being that the only witness to such an offense is often a young child who may be unable to testify

86

adequately about what has happened." *People v. Mitchell*, 155 Ill. 2d 344, 351, 614 N.E.2d 1213, 1216 (1993). "The complaints of youthful victims become more credible, more reliable, and better understandable when supported by the testimony of adults corroborating them." *Id.*

¶ 249 In the present case, the content of M.B.'s statements tend to support their reliability. The statements reflect a knowledge of sexual activity that is unexpected and unusual for a three-year-old child. M.B.'s statements were stated in age-appropriate terms and involved things that a child that age generally would not state. There is no evidence that M.B. had a motive to lie at three years old. In addition, M.B.'s statements that she later made to Melissa and to Mangiaracino were consistent with her initial statements to Buttry. The timing and circumstances surrounding the statements also tend to support their reliability. M.B. first made the statements when she was alone with Buttry, and at the time, she was nervous, anxious, and concerned about Melissa finding out because she did not want the defendant to get into trouble. The defendant argues that Buttry was biased when she questioned M.B. about the abuse, but the consistency of M.B.'s statements after Buttry's questioning supports the admission of the statements under section 115-10 standards. On retrial, the defendant obviously can cross-examine Buttry on this point, raising questions related to her credibility in telling the jury about M.B.'s statements, but this is not a basis for reversing the circuit court's ruling to admit the evidence under section 115-10.

¶ 250 M.B.'s initial statements to Buttry about the abuse came about because of Buttry's questioning, but the fact that the initial statements were made in response to questioning

does not automatically justify the exclusion of the statements. "The fact that a complaint is made in response to questioning *** does not necessarily destroy its admissibility." *People v. Branch*, 158 Ill. App. 3d 338, 342, 511 N.E.2d 872, 874 (1987). Considering M.B.'s age, her complaints to Buttry, Melissa, and Mangiaracino had corroborative value, and the trier of fact could consider the questions asked by Buttry, Melissa, and Mangiaracino in determining the relative weight of these complaints. *Id.*

¶ 251 Given that a child might be unwilling to discuss her own traumatic experience involving sexual abuse, the circuit court could find that the questions that Buttry asked M.B. were necessary for M.B. to overcome her reluctance. See *People v. Sundling*, 2012 IL App (2d) 070455-B, ¶ 36, 965 N.E.2d 563. Nothing in the record suggests that the questions asked by Buttry, Melissa, or Mangiaracino were unduly suggestive or coercive, and M.B.'s responses were in her own words. See *People v. C.H.*, 237 Ill. App. 3d 462, 469, 603 N.E.2d 1280, 1285 (1992); see also *People v. Wittenmyer*, 151 Ill. 2d 175, 187, 601 N.E.2d 735, 741 (1992) (out of court statements to a police detective by a minor sex abuse victim properly admitted where the victim's answers were primarily in her own words and nothing in the record indicated that the interviews were threatening or coercive). The fact that Buttry had to ask some questions of M.B. in order to encourage her to be more candid is understandable in light of her age. *People v. Edwards*, 224 Ill. App. 3d 1017, 1031, 586 N.E.2d 1326, 1335 (1992) ("It is entirely unrealistic to expect a child to speak about such topics in the course of casual conversation.").

¶ 252 It does not appear that the environment of Mangiaracino's interview was unduly coercive. Mangiaracino was the only person in the room with M.B. during the interview.

She followed questioning protocol, eliciting information designed to have a yes or no answer, then followed up with open requests for detail. Nothing in the recorded forensic interview indicates that Mangiaracino led M.B. to state anything that M.B. did not state on her own and in her own words.

¶ 253  Also, we note that, because of a child sexual abuse victim's reluctance, a delay in reporting abuse or initial denials of abuse will not automatically render a victim's statements inadmissible under section 115-10. *People v. Zwart*, 151 Ill. 2d 37, 46, 600 N.E.2d 1169, 1173 (1992). M.B.'s initial reluctance to make statements to Buttry and Melissa is explained by her concern about her daddy getting in trouble.

¶ 254  "The General Assembly enacted section 115-10 of the Code to allow admission of 'detailed corroborative evidence of the child's complaint about the incident to another individual' out of a concern that 'child witnesses, especially the very young, often lack the cognitive or language skills to effectively communicate instances of abuse at trial [citation], or may be impeded psychologically in their efforts to do so.' " *People v. Boling*, 2014 IL App (4th) 120634, ¶ 83, 8 N.E.3d 65 (quoting *People v. Bowen*, 183 Ill. 2d 103, 115, 699 N.E.2d 577, 584 (1998)). M.B. is exactly the type of child witness that the General Assembly was concerned about in enacting section 115-10. The prompting used by Buttry as described in her testimony was not improper but was legitimately used to get M.B. to talk about a very sensitive subject. The consistency of M.B.'s statements to Buttry, Melissa, and Mangiaracino provides sufficient guarantees of reliability to satisfy section 115-10.

¶ 255 An abuse of discretion occurs where the trial court's decision is arbitrary, fanciful, or unreasonable or where no reasonable person would agree with the position adopted by the trial court. *People v. Becker*, 239 Ill. 2d 215, 234, 940 N.E.2d 1131, 1142 (2010). Under this standard, and considering the totality of the circumstances, we cannot say that the circuit court abused its discretion in allowing the admission of M.B.'s statements under section 115-10.

¶ 256 Finally, we note that the defendant did not raise an issue with respect to the sufficiency of the evidence to sustain his convictions. However, "[b]ecause we are remanding this cause for a new trial, we must consider whether another trial would violate the double jeopardy clause." *People v. Ward*, 2011 IL 108690, ¶ 50, 952 N.E.2d 601. "If the totality of the evidence presented at defendant's first trial was sufficient for a rational trier of fact to find that the essential elements of the crime had been proven beyond a reasonable doubt, no double jeopardy violation is created on retrial." *Id*. In the present case, the State's evidence, if believed, was sufficient to establish the defendant's guilt beyond a reasonable doubt. Therefore, a retrial does not violate the defendant's right against double jeopardy. We do not, however, express any opinion concerning the defendant's guilt or innocence. *People v. Sutton*, 349 Ill. App. 3d 608, 621, 812 N.E.2d 543, 554 (2004) (citing *People v. Taylor*, 76 Ill. 2d 289, 309, 391 N.E.2d 366, 375 (1979)).

¶ 257                           CONCLUSION

¶ 258 For the foregoing reasons, we reverse the defendant's convictions and sentence and remand for a new trial.

¶ 259   Reversed and remanded.

2016 IL App (5th) 130119

NO. 5-13-0119

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 11-CF-660 |
| | ) | |
| MICHAEL S. BURGUND, | ) | Honorable |
| | ) | Ann Callis, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

**Opinion Filed:**      November 22, 2016

_____

**Justices:**      Honorable Bruce D. Stewart, J.

Honorable Melissa A. Chapman, J., and
Honorable Judy L. Cates, J.,
Concur

_____

**Attorney**      Curtis M. Dawson, Lucco, Brown, Threlkeld & Dawson, LLP, 224
**for**      St. Louis Street, P.O. Box 539, Edwardsville, IL 62025
**Appellant**

_____

**Attorneys**      Hon. Thomas D. Gibbons, State's Attorney, Madison County
**for**      Courthouse, 157 North Main Street, Suite 402, Edwardsville, IL 62025;
**Appellee**      Patrick Delfino, Director, Stephen E. Norris, Deputy Director, Patrick
      D. Daly, Staff Attorney, Office of the State's Attorneys Appellate
      Prosecutor, 730 East Illinois Highway 15, Suite 2, P.O. Box 2249, Mt.
      Vernon, IL 62864

_____